# Exhibit B

Page 1

1
2    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
3    Docket No.: 1:16-cv-5171 (PKC)(RML)
     - - - - - - - - - - - - - - - - - - - - - x
4    THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,
5                          Plaintiff,
6                 - against -
7    ELI INZLICHT-SPREI, individually, as trustee
     and/or beneficiary of the SARA SPREI FAMILY
8    TRUST, and as Executor of the ESTATE OF SARA
     SPREI; AVI ROSENFELD, as trustee of the SARA
9    SPREI FAMILY TRUST; ALAN RUBENSTEIN, as
     trustee of the SARA SOREI FAMILY TRUST; and
10   WELLS FARGO BANK, N.A.,
11                         Defendants.
     - - - - - - - - - - - - - - - - - - - - - x
12   WELLS FARGO BANK, N.A.,
13                         Cross-Claim Plaintiff,
14                - against -
15   ALAN RUBENSTEIN, as trustee of the SARA
     SPREI FAMILY TRUST,
16
                            Cross-Claim Defendant.
17   - - - - - - - - - - - - - - - - - - - - - x
18                       90 Park Avenue
                         New York, New York
19                       December 12, 2017
                         11:32 a.m.
20
21        VIDEOTAPED DEPOSITION of HERMAN SEGAL, taken
22   before Brittany Saline, a Professional Shorthand
23   Reporter and Notary Public of the State of New
24   York, pursuant to the Federal Rules of Civil
25   Procedure.

```
                                             Page 6

  1

  2           MS. QUIRÓS:  Courtney Quirós with

  3       Alston & Bird representing Wells

  4       Fargo.

  5           MR. PANETH:  Michael Paneth,

  6       Paneth & O'Mahony, representing Alan

  7       Rubenstein as trustee of the Sara

  8       Sprei Family Trust.

  9           THE WITNESS:  Herman Segal,

 10       witness.

 11           MR. KROLL:  Gerry Kroll

 12       representing Eli Inzlicht-Sprei.  And

 13       I would just like to have the record

 14       corrected by the videographer, that

 15       the deposition is not being taken by

 16       the plaintiff.  Plaintiff has been --

 17       it is being taken by the defendant,

 18       Wells Fargo.

 19           MR. SAWICKI:  I think he said

 20       claimant.

 21           MR. VIDUCICH:  And Robert

 22       Viducich-Schultz on behalf of Dr. Eli

 23       Inzlicht.

 24   H E R M A N    S E G A L, the witness herein,

 25   having been duly affirmed to tell the truth, the
```

1              Herman Segal

2    whole truth, and nothing but the truth relating to

3    said matter, was examined and testified as

4    follows:

5              THE WITNESS:  I so affirm.

6    BY MR. SAWICKI:

7         Q    Thank you.  Good morning,

8    Mr. Segal.  Thank you for coming.

9              Would you please show your

10   driver's license to the video camera before

11   we start?

12        A    (Complying.)

13             THE VIDEOGRAPHER:  Okay.

14        Q    Thank you.

15             You indicated, Mr. Segal, that

16   your home address is 4115 Quentin Road; is

17   that correct?

18        A    Yes, it is.

19        Q    In Brooklyn?

20        A    Yes, it is.

21        Q    And how long have you lived

22   there?

23        A    About 16 years.

24        Q    Where did you grow up?

25        A    I grew up in Brooklyn in Borough

```
                                    Page 12
 1                   Herman Segal
 2   because they weren't within the statutory
 3   definition of viatical, which is imminent
 4   death of a year or two, but they still had
 5   a value as far as selling them.
 6        Q    And when you say policies on
 7   older people, do you mean life insurance
 8   policies?
 9        A    Yes, I do.
10        Q    When did you start engaging in
11   life insurance policy transactions?
12        A    I had been buying policies over
13   the years as an investor and then in 2007,
14   approximately, I started going into the
15   business of procuring the policies and
16   actually taking out policies as well as
17   selling them.
18        Q    Okay.  And how long did you
19   engage in that activity?
20        A    The business was about -- about
21   four years, five years, and then sometime
22   in approximately 2010, 2011, the business
23   atmosphere for this type of business, which
24   was life settlement, became untenable and
25   it was no longer viable.
```

```
                                                    Page 15
 1                    Herman Segal
 2        identification as Exhibit 142 as of
 3        this date.)
 4        A    (Perusing.)  Pen by chance?
 5        Q    Sure.  Remember, Herman, don't
 6   write on the originals there.
 7             Do you want a piece of paper?
 8        A    If I can have a pad or something,
 9   please.
10        Q    Yeah, sure.
11        A    It's good you reminded me.  Thank
12   you.
13        Q    Ready.  Mr. Segal, I put before
14   you what we've marked as Sprei -- or
15   Exhibit No. 142 in this case.  It is a New
16   York Department of State Division of
17   Corporations form for an entity named Omega
18   Venture Capital Limited.  The initial
19   filing was in December of 2005.
20             Is this an entity that you formed
21   in or about December 2005?
22        A    Yes, it was.
23        Q    And is 1243 48th Street,
24   Brooklyn, New York 11219 a business address
25   of yours in 2005?
```

```
                                        Page 16
 1                    Herman Segal
 2         A     Yes, it was.
 3              MR. SAWICKI:  Gerry, I'm going to
 4         do Signature Premium Funding next.
 5              MR. KROLL:  Okay.  I know where
 6         these are already.  I know that.
 7              MR. SAWICKI:  Yeah, okay.
 8         Thanks.
 9              (Two-page document was marked for
10         identification as Exhibit 143 as of
11         this date.)
12         Q    All right.  Before we -- before
13    we go on to the next exhibit, Mr. Segal,
14    let me ask you about Omega Venture Capital.
15              What was the business that that
16    entity engaged in?
17         A    It was just a catchall -- alter
18    ego, any time that I was doing anything
19    other than using my name, I would use Omega
20    Venture Capital.
21         Q    Okay.  I put before you Exhibit
22    No. 143, which is another New York
23    Department of State Division of
24    Corporations form for an entity called
25    Signature Premium Funding Limited.
```

```
                                            Page 18
 1                    Herman Segal
 2   entities?
 3        A     Yes, it was.
 4        Q     Now, with respect to all -- well,
 5   we will do that next.
 6             What was the business of
 7   Centurion Settlements?
 8        A     Also the intent in this was
 9   selling policies, buying policies, hence
10   the name settlements.
11        Q     Okay.  Let's do one more.
12             (Two-page document was marked for
13        identification as Exhibit 145 as of
14        this date.)
15        Q     Mr. Segal, Exhibit No. 145 is
16   another department of -- New York
17   Department of State Division of
18   Corporations form for an entity called
19   Signature Capital Group Limited, also
20   formed in June of 2007.
21             Is this another one of your
22   entities?
23        A     Well, used my entities, that I
24   did form it and I was involved with it, but
25   I wasn't the necessarily the sole owner.
```

Page 19

1          Herman Segal

2      Q      Okay.   What -- were you a part

3  owner of Signature Capital Group Limited?

4      A      Yes, I was.

5      Q      What about the other three

6  entities, Signature Premium Funding,

7  Centurion Settlements, and Omega Venture

8  Capital, were you the sole owner of all

9  three of those entities?

10      A      No, Omega Venture Capital I was

11  the sole owner.   Signature Premium Funding

12  and Centurion Settlements, the Premium

13  Funding, I'm pretty sure we never did

14  anything, but Centurion Settlements when we

15  opened bank accounts, I specifically recall

16  that there were other signatories.

17      Q      Who were they on the Centurion

18  Settlements?

19      A      They were Alan Spiegel and his

20  brother Steven Spiegel.

21      Q      So to the best of your memory,

22  were they part owners of that Centurion

23  Settlements business -- entity rather?

24      A      Well, when you say part owners,

25  shares were never actually distributed.   To

1            Herman Segal

2   the best of my recollection, there were

3   different bank accounts and different banks

4   and I opened an account in one bank and the

5   Spiegels opened an account in another bank

6   and to that extent we were partners.

7        Q    Okay.  And did you -- by

8   partners, did you share in the proceeds and

9   profits from the business activities of

10  Centurion Settlements?

11       A    It was often hard to

12  differentiate between what profits were

13  attached to what part of the transaction in

14  the policy, but the intent was that we

15  would be equal partners in the settlement

16  aspect or at least when we were both

17  involved in settling the policy.

18       Q    Okay.  And what about Signature

19  Capital Group, what was the purpose of that

20  business entity?

21       A    That was the entity that was

22  primarily involved in writing the policies.

23       Q    Did Signature Capital Group have

24  licensed insurance agents as employees?

25       A    Yes, it did.

Page 21

1                    Herman Segal
2        Q    Was your son, William Segal, a
3   licensed insurance agent who worked for
4   Signature Capital Group in the 2007 to 2010
5   time frame?
6        A    Yes, he was.
7        Q    Was your son, William Segal, a
8   part owner of Signature Capital Group?
9        A    Not at the beginning, but
10  somewhere along the way, yeah -- yes.
11       Q    Were the Spiegels also part
12  owners of that business?
13       A    I don't think so.
14       Q    Was another one of the owners
15  Nathan Berger, another life insurance agent
16  who worked there?
17       A    At some point.  At some point he
18  left the business.
19       Q    Okay.
20       A    And at some point he was a
21  partner.
22       Q    Was Signature Capital Group a
23  licensed general agency for life insurance
24  companies?
25       A    No.

Page 22

1                     Herman Segal

2          Q     But did you work through any

3    licensed general agents for life insurance

4    companies in connection with the business

5    activities of Signature Capital?

6          A     Yes, we did.

7          Q     Which ones?

8          A     Primarily would be -- was the

9    general agent was Innovative -- which was

10   convenient, around the corner from our

11   office.

12         Q     Was it Innovative Brokers?

13         A     I believe so, yes.

14         Q     Any others?

15         A     There may have been one or two

16   policies that were written through another

17   general agent, but I'm not sure, I was

18   really not involved in that aspect of the

19   business.

20         Q     Okay.  Now, let me ask you to

21   explain a little more detail of the nature

22   of these life insurance policy

23   transactions.

24               You indicated that you got

25   involved particularly through the Signature

```
                                              Page 23
 1                    Herman Segal
 2    Capital Group entity with procuring life
 3    insurance policies on -- were the -- who
 4    were the insureds that you were writing
 5    policies on at the -- in the 2007 to 2010
 6    time frame?
 7         A     Any one who fit the criteria.
 8         Q     And what were the criteria,
 9    generally speaking?
10         A     Age had to be at least in the 70s
11    or above, health had to be reasonably good,
12    so that we would get, at a minimum, a
13    standard rating, if not a preferred rating.
14         Q     And what impact did the
15    standard -- did the rating have on -- on
16    the procurement of the policy?
17         A     Well, if the rating was
18    preferred, the premiums would be cheaper
19    and, hence, the policy would be more
20    valuable in a few years, when the policy
21    was intended to be sold.
22         Q     Any other criteria besides for
23    age and health?
24         A     Well, the family had to be able
25    to show substantial assets, so that the
```

```
                                        Page 24
 1                    Herman Segal
 2   insurance companies would agree to issue
 3   larger amount policies, because we weren't
 4   interested in doing small policies and the
 5   family -- and the insured had to be onboard
 6   with the entire business.
 7        Q      And what was the entire business?
 8   What was the business concept for procuring
 9   these policies on elderly people with
10   decent health able to show substantial net
11   worth?
12        A      That subsequent to the two-year
13   contestability periods, the policies would
14   be sold.
15        Q      Sold to whom or what type of
16   entity?
17        A      Well, there was hedge funds that
18   were buying these policies.
19        Q      Okay.  And what is the
20   significance of the two-year contestability
21   period?
22        A      Well, the -- no hedge fund would
23   buy a policy unless it was at least two
24   years old because they were never sure that
25   the insurance company would pay out the
```

Page 25

1              Herman Segal
2    death benefit if the person died prior to
3    the two-year period.
4              Additionally, the insurance
5    companies were suspect of any policies that
6    were transferred within the two years, and
7    that, in and of itself, could cause an
8    investigation.
9         Q    Okay.  Was it your understanding
10   that the life insurance companies who were
11   issuing these policies had the right under
12   their insurance contracts and/or the law to
13   contest the validity of the policies during
14   that initial two-year period?
15        A    They definitely had the right
16   to -- to challenge a policy within the
17   two-year period for factors such as
18   insurable interest and assets.
19        Q    Okay.  And was that part of the
20   reason that you decided to wait for more
21   than two years before you turn around and
22   try to sell the policies to hedge funds and
23   others?
24        A    Yes, there was no market within
25   two years.

```
 1                    Herman Segal
 2        Q      Okay.  In this case, we have a
 3   20 million-dollar insurance policy issued
 4   by Lincoln National on the life of a woman
 5   named Sara Sprei, S-P-R-E-I.
 6                Were -- were you and Signature
 7   Capital involved in procuring this -- the
 8   policy at issue?
 9        A      When you say "procuring," do you
10   mean did we write the policies?
11        Q      Yes.
12        A      Yes, we did.
13        Q      Okay.  For a -- a policy with a
14   faceup value of $20 million on an elderly
15   woman who had decent health, generally
16   speaking, what was the range of the annual
17   premiums due and owing on that policy?
18        A      The premiums depended on the age
19   and depended on if it was standard or
20   preferred and if the premiums were --
21   originally they were set up to be level
22   payments, but in actuality, the cost of
23   insurance would obviously go up the older
24   the person paid.
25        Q      Okay.  And what -- what dollar
```

Page 29

Herman Segal

1

2      Q      And what was the commission

3  payable to the insurance agent on a

4  20 million-dollar policy with the first

5  year premium of about $1 million?

6      A      It would be close to 100 percent.

7      Q      Or a million dollars?

8      A      Yes.

9      Q      And in this case, was your son,

10  William Segal, the insurance agent on the

11  Sara Sprei policy?

12      A      Yes, he was.

13      Q      Does that mean that he was due

14  the million dollars in commissions that

15  were generated from the sale -- or the

16  issuance of the policy?

17      A      No.  We used Signature Capital as

18  the entity that would get the commission.

19      Q      Okay.  Now, as part of -- of --

20  you indicated that the family of the

21  insured would have to be onboard for the

22  entire transaction.

23          Does that mean that they were

24  made aware that the policy would be sold

25  after the two-year period and had to agree

```
                                                    Page 30
 1                    Herman Segal
 2    to that concept?
 3         A    Well, they always had the right
 4    to keep the policy, if they wanted to, but
 5    that would --
 6              MR. SAWICKI:  Go off the record
 7         again.
 8              THE VIDEOGRAPHER:  The time now
 9         is approximately 12:04.  We're going
10         off the record.
11              (Discussion was held off the
12         record.)
13              THE VIDEOGRAPHER:  The time is
14         12:07 p.m.  We're back on the record.
15    BY MR. SAWICKI:
16         Q    Thank you.  Mr. Segal, you
17    indicated that the family had the right to
18    keep the policy.  Was the initial concept
19    that -- strike that.
20              Was it contemplated that the
21    family would be paying the initial premium
22    as part of the issuance of this large life
23    insurance policy?
24         A    If they did, they would be
25    reimbursed relatively quickly, but no,
```

Page 31

1                          Herman Segal

2    usually they would not make the premium in

3    the sense that they would risk any money.

4         Q      Okay.   What was the source of the

5    funding for the initial premium?

6         A      Depending on the carrier and

7    depending on the situation, usually, we

8    would use Himelsein and Mandel to fund the

9    policies.

10        Q      Is one of their entities known

11   as -- or called HM Ruby?

12        A      Yes, that was the entity that was

13   used.

14        Q      Okay.   If the family decided that

15   they did not want to keep the policy after

16   its issuance, was it contemplated that the

17   family would be personally responsible for

18   any of the insurance premiums between the

19   time of issuance and the sale of the

20   policy?

21        A      No, of course not.   There was a

22   put option that was simultaneously executed

23   with the loan documents and the put option

24   allowed the family or the trustee to give

25   up the policy to the HM Ruby Fund and the

```
                                          Page 32
 1                    Herman Segal
 2    loan would then become nonrecourse.
 3         Q     Okay.  When these policies were
 4    procured or written, as you said, and
 5    issued by the insurance policy, who was set
 6    up to be the -- who or what entity was set
 7    up to be the owner of the policy?
 8         A     Specifically in this case or in
 9    general?
10         Q     Generally speaking first.
11         A     Generally speaking, it would be a
12    trust that was set up.
13         Q     In the nature of a life insurance
14    trust?
15         A     Yes.
16         Q     In the name of the family?
17         A     In the name of the insured.
18         Q     Okay.  And who was selected to be
19    the trustee of this life insurance trust?
20         A     Any attorney who was okay with
21    this type of arrangement.
22         Q     Why were attorneys used or
23    selected to be the trustees of these
24    trusts?
25         A     Oh, in addition to the fact that
```

Page 33

1              Herman Segal

2    there was a lot of money involved and we

3    needed someone that was trustworthy, the

4    lender required either an attorney or a

5    CPA, so that they would have a certain

6    amount of comfort.

7         Q     And the lender being HM Ruby

8    generally?

9         A     Yes.

10        Q     Okay.  Let's talk more

11   specifically about -- strike that.

12              You indicated that Steven Spiegel

13   and Alan Spiegel had some ownership or

14   partnership interest in these entities

15   we've identified.  Were either of them

16   licensed insurance agents?

17        A     They were not.

18        Q     Were you a licensed insurance

19   agent?

20        A     I was not.

21        Q     What role did -- if any, did

22   Mr. Alan Spiegel and Steven Spiegel play in

23   connection with these life insurance

24   transactions?

25        A     Firstly, they were the ones who

```
                                        Page 34
 1                  Herman Segal
 2   connected the HM Ruby Fund to Signature
 3   Capital and that was the source of most of
 4   the funding of our policies.  And secondly,
 5   they would procure insureds.
 6        Q    And by procuring insureds, what
 7   did you mean -- what do you mean?
 8        A    They would find clients to write
 9   policies on.
10        Q    And then how would you and your
11   partners go about finding persons or
12   entities to buy these insurance policies
13   after the two-year contestability period
14   passed?
15        A    It was a healthy market of
16   companies who bought life settlements and
17   were brokers who would find a buyer.
18        Q    And are these brokers known as
19   life settlement brokers?
20        A    Yes, they were.
21        Q    Is this a separate -- was this a
22   regulated business in the 2007 to 2010 time
23   frame?
24        A    It became regulated during that
25   time frame.
```

```
                                        Page 41

  1                Herman Segal

  2       A    Only subsequent to the policy

  3   being issued.

  4       Q    Did you become -- when you met

  5   Mr. or Dr. Inzlicht-Sprei, did you become

  6   aware that your son, William Segal, had

  7   been involved in the procurement of the

  8   policy on Sara Sprei?

  9       A    Yes.

 10            MR. SAWICKI:  Gerry, I'm going to

 11       Exhibit No. 40 in this case.  The

 12       handwritten agreement.

 13            MR. KROLL:  Okay.  Just -- can

 14       you give me one second to pull it up.

 15       That's not in the documents that were

 16       sent, right --

 17            MS. GWOREK:  Yes, it is.

 18            MR. KROLL:  It is on there, okay.

 19       I will put it up.

 20            MS. GWOREK:  It's 2008/4/28 date,

 21       Exhibit 40.

 22            MR. KROLL:  Okay.  Cool.  Hold on

 23       one second.  I -- hold on.  Got it.

 24       We have it.  Thank you.  Got it.

 25            MR. SAWICKI:  Okay.  Great.
```

Page 42

1                    Herman Segal

2              (One-page handwritten agreement

3         previously marked for identification

4         as Exhibit 40 on 10/20/17.)

5         Q       Mr.  -- Mr. Segal, Exhibit No. 40

6    is a handwritten agreement that Dr. Eli

7    Inzlicht-Sprei has already testified that

8    he entered into and signed.

9              Is that your signature on the

10   bottom of this one-page agreement?

11        A       It appears so, yes.

12        Q       Did you enter into this agreement

13   with Mr.  -- with Dr. Eli Inzlicht-Sprei on

14   or about April of 2008?

15        A       Apparently I did.

16        Q       And was this an agreement related

17   to the Lincoln National policy on Ms. Sara

18   Sprei?

19        A       Yes, it was.

20        Q       Did you agree with

21   Dr. Inzlicht-Sprei as it says in No. 1 that

22   the premium payments for that policy will

23   be made by Signature Capital whether

24   directly or through third parties?

25        A       Yes.

```
                                            Page 43

 1                   Herman Segal
 2        Q     Did you also agree that the
 3   trustee would be agreed to in advance by
 4   both parties?
 5        A     Yes.
 6        Q     And is that the trustee for the
 7   life insurance trust that would be the
 8   owner of the policy?
 9        A     Yes.  The trustee of the trust
10   that owned the policy, yes.
11        Q     Did you also agree with
12   Dr. Inzlicht-Sprei, as it says in No. 3,
13   that upon the sale of the policy or the
14   death of the insured, 5 percent of the
15   gross proceeds would go to the doctor and
16   the remaining 95 percent will go to
17   Signature Capital?
18        A     That's what it says, but there
19   were other things that were understood that
20   weren't necessarily listed --
21        Q     What other things?
22        A     He was a client of Spiegel, I did
23   not know him until the policy was already
24   written or was about to be written or was
25   already in effect, so to speak.  He wanted
```

Page 44

1                    Herman Segal

2    something in writing, most people did not.

3    Most agreements were done just by

4    handshake.

5              So it does say 5 percent, but the

6    understanding was that if there was a

7    sudden death and they actually paid out,

8    that he would get 10 percent.

9        Q    So if Mr. Sara Sprei died and

10   $20 million were paid out, you had an

11   understanding that Dr. Inzlicht-Sprei, that

12   he would get $2 million and Signature

13   Capital would get $18 million?

14       A    That's correct.

15       Q    But in the -- according to this

16   agreement, in the event of the sale of the

17   policy, prior to Ms. Sprei's death, did

18   this paragraph 3 control that is that

19   Dr. Inzlicht-Sprei was -- was supposed to

20   get 5 percent of the proceeds of the sale

21   of the policy and 95 percent would go to

22   Signature Capital?

23       A    No.  He certainly would have had

24   the right to make a decision as to what he

25   wanted the policy to go forward if -- in

```
                                              Page 45
 1                    Herman Segal
 2    other words, if, for example, we were
 3    lapsing the policy, he would have the right
 4    to say don't lapse it, I will pay it going
 5    forward.  If he was selling it, he would
 6    have the right to say let me buy it,
 7    et cetera.
 8          Q    Okay.
 9          A    And that's not anywhere in this
10    agreement.
11          Q    Are you saying it was
12    contemplated that he would be informed as
13    to what Signature Capital intended to do
14    with the policy and given them the option
15    to take it over or --
16          A    Yes.  The understanding was that
17    on all of our clients that they had input
18    after two years what we would do with it.
19          Q    Okay.  The next paragraph in this
20    agreement, Exhibit 40, says that nothing
21    obligates Signature Capital to maintain the
22    policy, however, should they -- and the
23    "they" being Signature Capital -- elect to
24    lapse the policy, Signature Capital will
25    pay Dr. Inzlicht-Sprei $50,000 as
```

Page 46

1                   Herman Segal

2    compensation.

3                   Was that part of your agreement

4    with Dr. Inzlicht-Sprei?

5         A    Yes, it was.  I mean, we didn't

6    make commission on the policy and he was

7    supposed to get a portion of the entire

8    profit on the policy, even though, when

9    these policies were financed, we didn't

10   keep anywhere near the entire commission,

11   HM Ruby took a chunk of it.  It was through

12   money that was made on the policy, so

13   that's why the 50,000 was not lost to us,

14   it was part of the profit.

15        Q    Okay.  Paragraph 5 says that

16   Signature Capital will fund the initial

17   premium by wiring money to the doctor, it

18   will then forward the money to Lincoln, the

19   insurance company and/or the trustee.

20                   Was that your agreement with

21   Dr. Inzlicht-Sprei?

22        A    Yes.  Even though, many a time,

23   they would change their mind and I'm not

24   sure I recall if this happened in this

25   case, many a time they decided not to do it

Page 47

1                    Herman Segal

2    that way, either timing-wise, we didn't

3    have enough cash flow or time to put the

4    money into the account and sometimes they

5    didn't want to do it because their

6    accountant told them not to do it, they

7    didn't want to be involved.

8              It was depending on each

9    situation.  But in a perfect world, that's

10   how it would have gone.

11        Q     Okay.  In any event, it was

12   contemplated that Dr.  -- neither Dr.

13   Inzlicht-Sprei nor his family would be

14   personally responsible for the initial

15   premium payment, correct?

16        A     That's correct, yes.

17        Q     Well, before we go on to the next

18   thing, let me go ahead and ask, paragraph 6

19   talks about an alternative dispute

20   resolution mechanism for any disputes

21   between you and Dr. Inzlicht-Sprei about

22   this agreement.

23              What is a Beit Din?

24        A     It's a religious court.

25        Q     Okay.  To your knowledge, has

Page 48

1               Herman Segal

2   Dr. Inzlicht-Sprei ever brought a claim

3   against you or Signature Capital in a Beit

4   Din concerning this agreement, Exhibit 40?

5           MR. KROLL:  Objection.

6       A    No, he has not.

7       Q    Have you ever initiated a claim

8   or -- in a Beit Din concerning this

9   agreement?

10      A    I have not.

11          MR. SAWICKI:  Next exhibit,

12      Gerry, is No. 48 (handing).

13          MR. KROLL:  48 and what -- let me

14      try to just pull that up, hold on.

15      What --

16          MR. SAWICKI:  It's the trust

17      agreement.

18          MS. GWOREK:  It's 2008/03.

19          MR. KROLL:  Hold on.  48.  Got

20      it.  Thank you.

21          (20-page Sara Sprei Family Trust

22      Agreement previously marked for

23      identification as Exhibit 48 on

24      10/20/17.)

25

Page 53

1                    Herman Segal

2        A     Well, there came a point in time

3   when there was friction between the

4   Spiegels and the Segals and at that point

5   there were -- there was basically a

6   dissolution of the partnership, there was

7   acrimony, there was animosity, and Mr. Alan

8   Rubenstein had allied himself or at least

9   not openly, but was my feeling that his

10  loyalties was with the Spiegels.

11             MR. SAWICKI:  Okay.  Gerry, we're

12        going to go to Exhibit No. 28.

13        (handing).

14             MR. KROLL:  Thank you.  Can you

15        give me a date, Todd.

16             MR. SAWICKI:  April 1, 2008.

17             MR. KROLL:  Got it.  Thank you.

18             (One-page letter dated 4/1/08

19        previously marked for identification

20        as Exhibit 28 on 9/28/17.)

21        Q     Mr. Segal, I put in front of you

22  Exhibit No. 28.

23             Is this a document that appears

24  on what was Signature Capital Group's

25  letterhead in 2008?

Page 54

1                    Herman Segal

2        A        (Perusing.) Yes.

3        Q        Is that your son's signature at

4   the bottom of the letter?

5        A        It appears to be his signature,

6   yes.

7        Q        Were you involved in the drafting

8   of this Exhibit No. 28?

9        A        I have no specific recollection,

10  and to the extent if I would have been, I

11  would plead the Fifth as well.

12       Q        Okay.  Did Ms. Sara Sprei and her

13  family, to your knowledge, have a net worth

14  of 48 -- of about $48 million in 2008, as

15  represented in this letter?

16       A        Obviously I don't know, but --

17  and that's where I should end my statement.

18  But probably could have known that it was

19  not an accurate description and, quite

20  frankly, Lincoln knew it as well.

21       Q        And by "not an accurate

22  description," do you mean that the

23  represented net worth was overstated --

24       A        Yes.

25       Q        -- in this letter?

Page 56

1                    Herman Segal

2          A     (Perusing.)

3                MR. KROLL:   What was that date

4          again?

5                MS. GWOREK:   2007/12/31.

6                MR. KROLL:   Right.   Exhibit 44.

7          I have it.   Thank you.

8                     (Sara Sprei & Family Statement of

9          Net Worth as of 12/31/07 previously

10         marked for identification as

11         Exhibit 44 on 10/20/17.)

12    BY MR. SAWICKI:

13         Q     Mr. Segal, have you ever seen

14    this draft, Accountant's Compilation Report

15    for Sara Sprei & Family Statement of Net

16    Worth as of December 31, 2007?

17         A     I don't recall seeing this, no.

18         Q     If you turn to the third page of

19    the Exhibit No. 44, it references a

20    certified public accountant, Isaac J. Baum

21    in Brooklyn, New York.

22                Do you know that person?

23         A     (Perusing.)   I've made his

24    acquaintance, I actually went to school, I

25    think, with him, many years before.

Page 57

1                          Herman Segal

2        Q      Do you know whether he actually

3    prepared this document, in March of 2008?

4        A      I assume he did.

5        Q      Do you know what he based the

6    information about the Sara Sprei and family

7    net worth on, when this report was

8    prepared?

9        A      I assume that that's what he was

10   asked.  It was represented that this was

11   her assets.

12       Q      Do you know who made the

13   representations to him about what the Sara

14   Sprei and family assets were at the time?

15       A      I do not, no.

16       Q      Do you know whether it was

17   anybody at Signature Capital?

18       A      Well, it was someone who had an

19   interest in the policy being written, so,

20   presumably, it was someone at Signature

21   Capital.

22       Q      Okay.

23       A      Possibly myself, if I -- I would

24   plead the Fifth if I was the one involved.

25              MR. SAWICKI:  Gerry, next exhibit

                     Herman Segal

1                    Herman Segal
2         is going be Exhibit 49, the life
3         insurance policy.
4              MS. GWOREK:  The date on that is
5         2008/03/25.
6              MR. KROLL:  Thank you, Melanie,
7         it's a lot easier.  Got it.  Thank
8         you.
9              By the way, what -- what's your
10        plans in terms of lunch or -- and a
11        break or anything?
12             MR. SAWICKI:  I hadn't decided
13        yet.  What's everybody pleasure?  Do
14        you want me to stop at 1 or 1:30?
15             MR. PANETH:  I am happy to keep
16        going and get out earlier, but
17        whatever works for everyone I'm fine
18        with.
19             THE VIDEOGRAPHER:  We've got to
20        switch the media at 1:00.
21             MR. SAWICKI:  Okay.  He's got to
22        change the tape at 1:00, so why don't
23        we break then for about 45 minutes.
24             MR. KROLL:  That's fine.
25             MR. SAWICKI:  For a quick bite.

```
                                              Page 59
 1                    Herman Segal
 2          MR. KROLL:  Okay.
 3          MR. SAWICKI:  Yeah, I think this
 4      is going to go more quickly.  This is
 5      going to go more quickly than last
 6      time, so we will be here --
 7          THE WITNESS:  Forty-five minutes
 8      is a quick bite, okay.
 9          MR. KROLL:  Oh, okay.  Quick
10      break.  Well, if you want to take a
11      quick break, then it's going to be a
12      good and the reporter will be alive
13      and the videographer will be well.
14      And we'll all be good.
15          MR. SAWICKI:  Yep, yep.
16          (Lincoln National Life Insurance
17      Policy previously marked for
18      identification as Exhibit 49 on
19      10/20/17.)
20  BY MR. SAWICKI:
21      Q    Okay.  Mr. -- Mr. Segal, I put
22  before you Exhibit No. 49, which has been
23  identified as the 20 million-dollar life
24  insurance policy on Sara Sprei.
25          Can you please turn to -- if you
```

Page 62

1              Herman Segal

2        Q      Do you know why this wire

3    transfer was sent to Dr. Inzlicht-Sprei on

4    this date, which is within a few week -- a

5    week or so after -- excuse me, a month or

6    so after this policy was issued?

7        A      When you say a month after the

8    policy was issued, does that mean that

9    money had already been paid?  There was a

10   premium already paid to the insurance

11   company?

12       Q      We'll see.

13       A      No, obviously, that would -- my

14   answer would be depending on if the premium

15   had already been paid or the premium had

16   not been paid.

17       Q      Okay.  If the premium had been

18   paid, what's your understanding of why you

19   were sending money to Dr. Inzlicht-Sprei on

20   this date?

21       A      If somehow Dr. Sprei had laid out

22   the money and advanced the money for the

23   premium, then this was a reimbursement.

24       Q      Okay.  Is it possible that

25   Signature Capital Group or one of your

Page 63

1              Herman Segal

2    entities advanced the initial premium

3    payment?

4       A    By sending this money to

5    Dr. Sprei --

6            MR. KROLL:  I object on the

7            grounds of privilege -- objection.

8            And that calls for speculation.  No

9            foundation.

10      Q    Okay.

11      A    If the premium hadn't been paid

12   and this money was sent to Dr. Sprei and

13   then the premium was subsequently paid,

14   then that would probably be the reason.

15      Q    That being that Signature Capital

16   Group or one of your entities was advancing

17   the initial premium payment?

18      A    Or we had gotten the money from

19   HM Ruby and we were passing it along to pay

20   the premium.

21      Q    I will represent to you,

22   Mr. Segal, that in connection with this

23   matter, a bank account was opened in the

24   name of the Sara Sprei Family Trust at

25   Chase Bank with Avi Rosenfeld as trustee.

Page 66

1              Herman Segal

2        Q     Do you recognize his handwriting

3    on any pages of this Exhibit No. 53?

4        A     I am not that familiar with his

5    handwriting.

6        Q     Okay.  This document shows, and I

7    will represent to you, that the HM Ruby

8    premium financing for this Sara Sprei

9    policy was arranged in or about August of

10   2008.  So a few months after the policy was

11   issued.

12             Does this give you a better

13   understanding or memory of how the initial

14   premium for the Lincoln National policy was

15   paid or funded?

16       A     I'm not sure if HM Ruby ever

17   advanced money prior to the process.  There

18   was a lot of money going back and forth

19   between HM Ruby and our account.  But if

20   they did not send any money before the

21   application process was complete, then it

22   must be paid through general funds of

23   Signature Capital.

24       Q     Who -- okay.  Just for

25   convenience purposes, let me just do one

Page 76

1                    Herman Segal

2     BY MR. SAWICKI:

3          Q       Mr. Segal, Exhibit 66 is a copy

4     of a check drawn on the Omega Venture

5     Capital Limited bank account Signature Bank

6     ending -- the account number ending in 1531

7     in the amount of $10,000 to Eli

8     Inzlicht-Sprei.

9               Is that your signature on the --

10         A     It is.

11         Q       -- on the check?

12         A     Yes.

13         Q     Do you remember why you sent

14    Mr. -- Dr. Inzlicht-Sprei a $10,000 check

15    on April 2009?

16         A     I do not.

17         Q     Do you recall whether

18    Dr. Inzlicht-Sprei had agreed to review

19    some medical records for your Signature

20    Capital Group in connection with your life

21    insurance transactions?

22         A     It does sound vaguely familiar

23    that he was doing some type of work for us.

24    And the only thing I can think of is

25    reviewing files.

Page 77

1          Herman Segal

2          I know we had some relationship,

3    so I do recall something, if it was on any

4    specific case or if it was on several

5    cases, but obviously it's too large an

6    amount to be on one case, so yes.

7       Q     And for what purpose would you be

8    asking Dr. Inzlicht-Sprei, or any doctor

9    for that matter, to review medical records

10   in connection with transactions you -- you

11   or Signature Capital were involved in?

12      A     I'm looking at the date of '09.

13   The only time we would need files reviewed

14   was either when we were buying a policy,

15   issuing a policy, or if we were selling a

16   policy, so in April of '09, I don't think

17   we were writing any more policies, so it

18   was presumably to sell a policy or maybe to

19   review a policy we were thinking of buying

20   on the secondary market.  I'm not sure.

21          But there would be different

22   scenarios where we needed medical files

23   reviewed to see if something was overlooked

24   by the life expectancy companies that we

25   used to evaluate someone's life expectancy.

Page 78

1                      Herman Segal

2        Q     Do you know whether and to what

3   extent and, if so, to what extent Mr.  --

4   or Dr. Inzlicht-Sprei was made aware of the

5   purpose of the requested review?

6        A     Oh, I'm sure he would have been

7   made aware of why we needed him to review

8   it, to know what to look out for.

9              So I recall a case where the

10  policy was either something we were

11  interested in buying or something we were

12  interested in selling and the AVS and 21st,

13  which were the two major companies that ran

14  life expectancies, that were used in the

15  industry to determine how long someone was

16  going to be expected to live, we used a

17  50 percent mark, that 50 percent would

18  presumably not be around at -- if the life

19  expectancy was, for example, four years, so

20  50 percent would be expected to be no

21  longer alive and 50 percent of people with

22  such a medical file would be expected to be

23  alive.  And it was obvious that the person

24  was diabetic and yet since both AVS and

25  21st used computer programs and use medical

Page 79

1                    Herman Segal
2    personnel that don't really study a file,
3    no one had put the word "diabetic" on the
4    person's file and because of that, we were
5    able to realize that the person's life
6    expectancy was substantially shorter than
7    what they had listed.
8              MS. GWOREK:  Gerry, we're going
9         to another Omega checking statement.
10         This one is 2010/08/31.
11              MR. KROLL:  Okay.  Just one
12         moment.  Got it.  Excellent.  Thank
13         you.
14              (Four-page document was marked
15         for identification as Exhibit 147 as
16         of this date.)
17    BY MR. SAWICKI:
18         Q    This is Exhibit 147.
19              Mr. Segal, can you confirm that
20    this is a Signature Bank bank account
21    statement for Omega Venture Capital for the
22    period ending August 31, 2010?
23         A    (Perusing.)  It appears to be so,
24    yes.
25         Q    On the second page, the bank

Page 83

1                    Herman Segal
2    Exhibit No. 12, which has been identified
3    as an e-mail exchange between Alan Spiegel
4    and folks at Berkshire Settlements, which
5    acted as the originator for the purchase of
6    this policy in 2010.
7                First of all, on the top of the
8    first page of Exhibit 12 of the signature
9    block, under Mr. Alan Spiegel's e-mail,
10   references R&S Capital Group LLC.
11               Do you know -- are you familiar
12   with that entity?
13        A    Yes.
14        Q    What is it?
15        A    It's an entity that Alan Spiegel
16   owned.
17        Q    Okay.  Did you have any ownership
18   in R&S Capital Group or any interest
19   whatsoever?
20        A    There was a point in time when he
21   had bought several policies from HM Ruby or
22   at least had bought their interest in the
23   policy and it's possible that pursuant to
24   that purchase we had some interest in R&S
25   Capital.  But other than that, no, I have

Page 87

1                    Herman Segal

2        A     Yes, I believe that's his current

3    telephone number.

4        Q     And his e-mail, right?

5        A     Yes, that's one of his emails.

6        Q     So as this document indicates,

7    this was -- these forms were filled out in

8    September 2010.

9              Does this refresh your memory

10   that this Sara Sprei Lincoln National

11   policy was sold to Berkshire Settlements in

12   a life settlement transaction in or about

13   September/October 2010?

14       A     Well, as recently as several

15   months ago, I had no recollection of this

16   policy being sold at all and I was made

17   aware of some of these e-mails that I was

18   somehow involved and I was made aware of

19   these e-mails by people who wanted me to

20   try to put pressure on Dr. Inzlicht to walk

21   away from this case.  And at that time, I

22   actually suspected that they were

23   forgeries.

24              However, since then, it's come to

25   my -- not through memory, but just from

Page 88

1              Herman Segal

2   seeing some of these things, that perhaps I

3   was aware at the time that the policy was

4   sold.

5        Q    And who were these people that

6   were trying to put pressure on you to

7   persuade Dr. Inzlicht-Sprei to walk away

8   from this case several months ago?

9        A    It was some people in the

10  community who felt that it was opening a

11  can of worms, so to speak, to have this

12  action go forward.

13       Q    And you knew who they were,

14  right?

15       A    Yes.

16       Q    And you spoke with them

17  personally or on the phone or some other

18  way?

19       A    Both.

20       Q    How many people are we talking

21  about?

22       A    Three, four.

23       Q    How -- how long -- during what

24  period of time did these communications

25  take place?

Page 94

```
 1                    Herman Segal
 2        hold on one second.  Hold on.
 3             MR. SAWICKI:  Sure.
 4             MR. KROLL:  Okay.  Got it.
 5             MR. SAWICKI:  All right.  Great.
 6             MR. KROLL:  Did you do this
 7        before?
 8             MR. SAWICKI:  No, there's two
 9        Centurion Settlements, there's an LTD
10        and an LCC -- LLC.  So I just wanted
11        to clean this up.
12             MR. KROLL:  Oh, okay.  Which one
13        are you marking it LLC or LTD?
14             MR. SAWICKI:  148 is LLC.
15             MR. KROLL:  Okay.  Got it.
16        Thanks so much.
17   BY MR. SAWICKI:
18        Q    Sure.  Mr. Segal, can you
19   identify Exhibit No. 48 -- strike that.
20             I will represent to you that this
21   is a -- 148 is a New York Department of
22   State Division of Corporations entity form
23   for Centurion Settlements LLC.
24             Is Centurion Settlements LLC
25   another entity that you created and were
```

Page 95

1                     Herman Segal

2     involved in?

3         A      From the face of it, it appears

4     to be that I formed it, but I have no

5     recollection as to why.   I can't even

6     imagine why I would do so and involved

7     in -- I have no recollection of being

8     involved with anything.

9              MR. SAWICKI:   Okay.  Gerry, next

10        we're going to Exhibit No. 19.

11              MS. GWOREK:   That's got a date of

12        2010/09/30.

13        Q     (Handing.)

14        A     (Perusing.)

15              MR. KROLL:   Got it.   Thank you.

16              (Bates-stamped document BSI - LN

17        v. Sprei 00000180 through 185

18        previously marked for identification

19        as Exhibit 19 on 9/28/17.)

20        Q     Mr. Segal, this Exhibit No. 19

21    has already been identified as a Viatical

22    Settlement Agent certificate in connection

23    with the Sara Sprei policy transaction.

24              Can you turn to the fourth page,

25    which is an insurance producer license for

Page 108

1              Herman Segal
2              THE VIDEOGRAPHER:  Sure.  Okay.
3         The time now is approximately
4         3 p.m.  We're going off the record.
5              (A short recess was taken.)
6              THE VIDEOGRAPHER:  Good
7         afternoon.  The time now is
8         approximately 3:14.  We're back on the
9         record.  It's the beginning of
10        Media 3.
11             MR. SAWICKI:  Thank you, Tom.
12    BY MR. SAWICKI:
13        Q    Mr. Segal, do you know a person
14    named Joseph Havas, H-A-V-A-S?
15        A    I do not, no.
16        Q    To the best of your memory, have
17    you ever had any business dealings with
18    Joseph Havas?
19        A    No, I'm sure I have not.
20        Q    Do you know whether that person
21    is related by blood or marriage to
22    Dr. Inzlicht-Sprei?
23        A    No.  Like I said, I never heard
24    the name, don't know anything about it.
25        Q    Take a look through Exhibit 151.

Page 109

1          Herman Segal
2          (158-page document was marked for
3     identification as Exhibit 151 as of
4     this date.)
5     A    Do I have it?
6          MR. KROLL:  Can you tell me the
7     name of that document again, please?
8          MR. SAWICKI:  It's November 10,
9     2010.  It's the sales document package
10    with the cover e-mail.
11    A    Okay.
12         MR. KROLL:  Oh, I got it.  Sorry
13    about that.  Thank you.
14    Q    Mr. Segal, Exhibit No. 151 is
15    a -- an e-mail from Alan Rubenstein to your
16    son and you enclosing the sales
17    documentation package for this policy.
18         Can you confirm that
19    HermanSega@aol.com was your e-mail address
20    in November 2010?
21    A    Yes, it was.  But can you please
22    tell me which page I'm going to?
23    Q    The first page, the very first
24    page is the e-mail cover.
25    A    Where it says "please see

Page 110

1                     Herman Segal

2    attached"?

3         Q      Yes.  Right above that is e-mail

4    addresses.

5         A      (Perusing.)

6         Q      To answer my question, was that

7    your e-mail address in 2010?

8         A      I know when I switched over, but

9    I'm sure in 2010 I still had that e-mail

10   address that I was using for certain

11   things, yes.

12        Q      And WilliamJSegal@gmail.com was

13   your son's e-mail address at the time, too,

14   right?

15        A      Yes, that's correct.

16        Q      Does this refresh your memory

17   that Alan Rubenstein sent you a copy of the

18   Sara Sprei policy sales documentation

19   package in November 2010?

20        A      No, it does not.  And I wouldn't

21   guarantee that it did, but there's no

22   reason to think he didn't if the other

23   things were as they were and maybe I opened

24   it.  Maybe not.

25               I mean, at that point, I know I

Page 111

1                    Herman Segal
2    wasn't trusting and believing him, so I
3    assume that he did this to show me that he
4    was being transparent.
5                 MS. GWOREK:  Gerry, we're going
6         to go to another e-mail.  This one's
7         dated 2010/11/21.
8                 (One-page e-mail dated 11/21/10
9         was marked for identification as
10        Exhibit 152 as of this date.)
11                MR. KROLL:  11/21/2010.
12                MS. GWOREK:  Right.  It's Sprei
13        funds due.
14        A     (Perusing.)
15                MR. KROLL:  Got it.  It's
16        Exhibit 62, right?
17                MR. SAWICKI:  I think it's a new
18        one.
19                MS. GWOREK:  It's the one right
20        below that.
21                MR. KROLL:  Oh, I see.
22                MS. GWOREK:  AR 237 is the Bates
23        stamp.
24                MR. KROLL:  Okay.  Great.
25                I have it now, thank you.

Page 126

1          Herman Segal

2     to go with this one and then I'm going

3     to add 69, 70, 71 and 72.

4          MR. KROLL:  Okay.  Hold on.

5          MR. SAWICKI:  68 through 72.

6          MR. KROLL:  And 67.  What's next

7     Todd, after 67.

8          MR. SAWICKI:  68.

9          MR. KROLL:  The whole thing?

10         MR. SAWICKI:  Yeah.  (Handing.)

11    A     (Perusing.)

12         (Documents previously marked for

13    identification as Exhibits 67 through

14    72 on 10/20/17.)

15    Q    Mr. Segal, you'll take a look

16    through Exhibit Nos. 67, 68, 69, 71 and 72.

17         A    Yes.  (Perusing.)

18         Q    Can you confirm for me that this

19    is a series of e-mails and related

20    documents that you exchanged or sent to

21    Dr. Inzlicht concerning your request that

22    he invest in policies in the name of the

23    insured Cilya Weinberger?

24         A    Yes, that's correct.

25         Q    In 2014?

Page 127

1                    Herman Segal

2        A    Yes.

3        Q    Why did you offer these

4   policies -- investment opportunity to

5   Dr. Inzlicht at this time?

6        A    I needed money and his wife, I

7   believe, had called about making a match

8   for my son with someone, she's an amateur

9   matchmaker, and in the course of the

10  conversation, she mentioned that she was

11  looking to invest in something and I

12  suggested this policies and I sent her the

13  e-mails as such.

14       Q    Okay.  And what -- what happened

15  in -- what was their response to your

16  request or your proposal?

17       A    They said they had no interest

18  and that was the end of it.

19       Q    Okay.

20            MR. SAWICKI:  Hey, Gerry, we

21       found a few additional documents in

22       the record that we want to use as

23       exhibits and Mel is going to e-mail

24       them to you.

25            MR. KROLL:  Oh, okay.

Page 139

1                    Herman Segal

2          Exhibit 42 on 10/20/17.)

3          A     (Perusing.)

4          Q     Mr. Segal, Dr. Inzlicht-Sprei has

5    identified Exhibit No. 42 as a copy of the

6    letter that he sent in to August -- sent

7    into Lincoln National dated August 28, 2016

8    making a claims -- claim to the policy and

9    providing a last will and testament of his

10   mother to Lincoln.

11              Do you see that?

12         A     Yes, but I believe this was

13   subsequent to the initial claim.

14         Q     Right.  The initial claim was

15   dated in August of 2016 and then this

16   letter came afterwards?

17         A     Well, they -- I believe Lincoln

18   had responded -- he had told me that

19   Lincoln had responded by saying that they

20   couldn't give him any information about

21   anything unless he had some nexus to

22   something, so I believe that that was the

23   point of this letter.

24         Q     Okay.  Did you help

25   Dr. Inzlicht-Sprei prepare this August 28,

Page 140

1                    Herman Segal

2      2016 letter, Exhibit 42?

3              A      Probably.

4              Q      Once it became apparent that

5      Lincoln was not going to pay the policy

6      proceeds to Dr. Inzlicht-Sprei, did you

7      provide him with advice as what to do?

8              A      No, no.  I only did -- was tell

9      him to send a letter to Lincoln so they

10     shouldn't pay out the money.  And

11     subsequent to that, I told him to speak to

12     his -- I think it was his son-in-law or his

13     son, who worked for Ira and told him he

14     should do what he thinks is right.

15             Q      And who is his son or son-in-law?

16             A      An attorney who worked for Ira.

17             Q      Did you -- did you connect

18     Dr. Inzlicht-Sprei to Jerry Kroll at any

19     point in time?

20             A      I did not, no.

21             Q      Mr. Segal, we've identified

22     several specific policies that you and your

23     partners were involved in.  The Bergman

24     case, the Baum case, the Sprei case, and

25     some others.

Page 157

1              Herman Segal
2      Q     You just said that in your
3  opinion, nothing could be done.
4          How did you know that nothing
5  could be done if you didn't try selling the
6  policy?
7      A     Well, first of all, this was not
8  the only policy.  There were other policies
9  and we saw the market was not there.  Plus
10  Alan Spiegel, who was acting as a
11  settlement broker at the time, told us that
12  there was no money available -- there were
13  no buyers, certainly not something that was
14  saddled with loans like the Sprei policy
15  was.
16      Q     So then, in your opinion, it
17  wasn't even worth trying to sell the
18  policy?
19      A     Well, I told Alan -- I don't
20  recall the conversation, but I'm sure he
21  was told to try to sell it.
22      Q     When you say you're sure, why are
23  you sure?
24      A     Because that's what we were
25  doing.  But all the policies either we had

Page 158

1                    Herman Segal
2    to make premiums on or we were being
3    squeezed by our lender to hand them over,
4    so we had a ticking time bomb situation, we
5    would lose the policies.
6         Q    We talked earlier about a
7    handwritten agreement that you had with
8    Dr. Inzlicht-Sprei, correct?
9         A    Yes.
10        Q    Now, you mentioned that there was
11   something that was not actually written in
12   that agreement, which was that -- but it
13   was part of the deal that he was supposed
14   to get 10 percent upon death instead of
15   5 percent, right?
16        A    Yes.
17        Q    Was there anything else that you
18   had agreed with Dr. Inzlicht-Sprei about
19   that was not embodied in that agreement?
20        A    Well, we basically had an
21   understanding that he would get some profit
22   out of this, that he wasn't just doing this
23   just for our benefit, that he was supposed
24   to benefit from this.
25        Q    Was there anything else that's

Page 163

1                    Herman Segal
2    you know, we're looking at every solution
3    and then there came a point when he was
4    told that the policy was gone.
5         Q    What solutions did you discuss
6    with him?
7         A    None.
8         Q    During that conversation, did he
9    ever tell you that he would want to pay
10   back the HM Ruby loan and take over the
11   policy?
12        A    No, he did not.
13        Q    Did he ever express any interest
14   at all in taking over the policy?
15        A    I never thought to ask him if
16   he -- if he wanted to do that because I
17   didn't know that the policy was that
18   imminent of being taken away.
19        Q    If Dr. Inzlicht had chosen --
20   Inzlicht-Sprei had chosen to take over the
21   policy and you mentioned earlier that --
22   that he had that option, what would have
23   happened with the HM Ruby loan that was
24   outstanding?
25             MR. KROLL:  Objection.

Page 164

1              Herman Segal

2        Incomplete hypothetical, lacks

3        foundation, calls for speculation.

4        A     He would have had to pay them

5    back or enter into some agreement with

6    them.

7        Q     Do you know approximately what

8    the -- what the amount due at that time was

9    to HM Ruby?

10        A     At the time I didn't know.  But

11    based on the numbers I see now, it was

12    about 3 million.

13        Q     Do you know whether Dr. Inzlicht

14    had $3 million or had access to $3 million

15    at that time to pay back -- to pay back

16    that loan?

17              MR. KROLL:  Objection.  No

18        foundation.  Facts not in evidence,

19        calls for speculation, calls for a

20        conclusion.

21        A     I do not and I did not.

22        Q     What would have happened if HM

23    Ruby's loan was not repaid?

24        A     Well, they never really had

25    the -- the mechanism for taking back the

1                    Herman Segal

2    policy.  It was my understanding that it

3    was -- it was always -- they had a model

4    when they started this was that they would

5    use their trustees.  And I believe the

6    language of the policies of the -- of the

7    agreement of the finance agreement said

8    that if it's not repaid at the end of the

9    24 months plus three-month grace period

10   that the policy is deemed to have been

11   handed over.

12            So I assume that they could just

13   call the trustee and say, all right, you

14   know, it's our policy now, it's for our

15   benefit.  I don't know.

16        Q    Did you have an agreement with

17   Dr. Inzlicht-Sprei as to how much money you

18   were supposed to be making in connection

19   with the policy?

20        A    No.

21        Q    Do you know if anyone else did?

22        A    No.

23        Q    Did you have an agreement with

24   anybody else as far as how much money you

25   were going to be making in connection with

Page 167

1                      Herman Segal

2        A     Of what?

3        Q     Of the proceeds, right, that you

4    just testified that you were -- you had a

5    split, you would get 50/50 with the

6    Spiegels on the proceeds and my question is

7    why?

8              What is it, if anything, that you

9    were doing in connection with the policy or

10   that they were supposed to do in connection

11   with the policy?

12       A     If the policy was procured or the

13   policy was disposed of?

14       Q     Well, at -- at any time.

15       A     I don't understand the question.

16   Why we were getting half or why they were

17   getting half?

18       Q     Well, you said they were getting

19   half because they brought the insured to

20   the table.  So now my question is:  Why

21   were you getting half?

22       A     For -- it was our business, we

23   had introduced them to it.  We were the

24   ones who actually wrote the policy.

25       Q     Did you have any roles or

```
                                        Page 168

 1                    Herman Segal

 2   responsibilities at all in connection with

 3   the Sprei policy?

 4        A     When it was originated?

 5        Q     At any point in time.

 6        A     Well, when it was originated, our

 7   responsibilities were to get the policy

 8   done that was financeable and could be sold

 9   at a profit.

10        Q     And after the policy was issued,

11   did you have any other ongoing

12   responsibilities?

13        A     No.

14        Q     Did you ever speak to the insured

15   Sara Sprei?

16        A     No.

17        Q     Did you ever have any written

18   communications with her?

19        A     No.  The proverbial, I wouldn't

20   know if she had bit me on the lip.

21        Q     Okay.  You testified earlier that

22   you don't know somebody by the name of

23   Joseph Havas and that you didn't do any

24   business with him, correct?

25        A     Yes.
```

Page 171

1                      Herman Segal

2       A      Well, I don't have much of a

3    recollection.   But in the recesses of my

4    mind, at that point, I believe the policy

5    had been, I guess, disposed of and that he

6    had the funds.

7       Q      Did you know of any reason why he

8    would have the funds?

9       A      I don't know if I knew that he

10   had become the trustee or if he had somehow

11   gotten them, no, I do not.

12      Q      Okay.  So when you learned at the

13   time that the policy had been disposed of,

14   did you have a discussion with Dr. Inzlicht

15   about that?

16      A      No.

17      Q      Is there a reason why you never

18   called him?

19      A      Yes.

20      Q      And what was that reason?

21      A      Because I was not going to be put

22   in a position where I would have to lie to

23   him.

24      Q      Did Signature Capital Group have

25   a bank account at Santander Bank?

Page 174

1               Herman Segal

2       Q     So then the answer is no, you

3   never searched that account for e-mails?

4       A     That's correct.

5       Q     What about the other e-mail

6   account Segal Herman@gmail.com, do you

7   still have access to that e-mail account?

8       A     I do.

9       Q     Did you search that e-mail

10  account for e-mails related to this case?

11      A     I did not.

12      Q     Is there a reason why not?

13      A     Same reason.  It was way too

14  broad.  And there was no reason for it

15  because they had access to it through the

16  bankruptcy trustee.

17      Q     Did you ever serve any written

18  objections to any of those demands?

19      A     No.

20      Q     Do you know whether you still

21  have e-mails in those accounts dating back

22  to 2010?

23      A     I don't believe so.

24      Q     And what, if anything, happened

25  to them?

```
                                          Page 175

 1                    Herman Segal
 2        A      I wouldn't have kept files going
 3    back that many years.
 4             MR. PANETH:  I'm sorry, can you
 5        read back the answer.
 6             (Answer was read back by the
 7        court reporter.)
 8        Q    And is there a reason why you
 9    wouldn't have kept files going back that
10    many years?
11        A    I have an IRS situation and I
12    certainly don't need e-mails that could be
13    incriminatory.
14        Q    What do you mean when you say you
15    have an IRS situation?
16        A    About two, three years ago I was
17    informed that I was under investigation by
18    the Criminal Division of the Internal
19    Revenue Service and --
20        Q    And at that time you deleted
21    e-mails?
22        A    Probably.
23        Q    Were there any particular e-mails
24    that you deleted or --
25        A    Just the entire years.
```

1           Herman Segal

2           MR. SAWICKI:   Gerry, Mr. Segal is

3       asking the court reporter to go back

4       to that passage if you want, I don't

5       know if you want to or not, or she

6       wants to.

7       A    I don't recall using that word,

8  but if I did, I will be happy to explain

9  it.

10          MR. SAWICKI:   Brittany says she

11      could do it, which is why she is such

12      an awesome court reporter on the

13      record.

14          MR. KROLL:   Okay.   Thank you,

15      Brittany.

16          (Requested part of the record was

17      read back by the court reporter.)

18      Q    What did you mean when -- what

19  you originally thought was a conspiracy was

20  actually what went down at the time.   What

21  did you mean by that?

22      A    Well, when I was confronted by

23  the various peoples who tried to stop the

24  lawsuit from continuing and they told me

25  that I was involved with getting money when

Page 180

1              Herman Segal

2    the policy was sold and I knew about it,

3    because I didn't have any recollection of

4    it, I denied it.  And then they showed me

5    e-mails, at which point they thought that

6    perhaps -- that that was somehow just, you

7    know, made up e-mails.  But in actuality, I

8    realized that I was involved with the sale

9    in 2010.

10        Q    Okay.  Let me direct your

11   attention, then, to Exhibit 44.

12             Tell me when you have the

13   document in front of you, please.

14        A    (Perusing.) Can you tell me which

15   144 is?

16        Q    It's the statement of net worth

17   document.

18        A    Oh, way back when.

19        Q    Correct.

20        A    Just 44, not 144.

21        Q    Let me take a look.

22             No, I don't believe it's 144.  I

23   think in my end Exhibit 144 --

24        A    Okay.  I think I'm getting there,

25   one second.

                                                    Page 181

1                      Herman Segal

2          Q      -- it's --

3          A      Can you give me some --

4          Q      -- it's a statement -- it's

5   statement of net worth, Sara Sprei Family

6   Statement of Net Worth as of December 31,

7   2007.

8          A      Can you give me some exhibits

9   surrounding it so I should be able to find

10  it?

11                MR. KROLL:  Can the reporter show

12          the witness Exhibit 44, please.

13          It's --

14                MR. SAWICKI:  It should be

15          relatively early in the deposition.

16         A      I got it.  Thank you.

17         Q      Okay.  Thank you.

18                Just take a look -- you were

19  asked earlier by counsel about this

20  document, which purports to be some type of

21  statement of net worth with the Sprei

22  family as of that date.

23                It's true, sir, that you don't

24  have any reason to believe that Sara Sprei

25  was involved in creating this document, do

Page 182

1              Herman Segal

2   you?

3        A        No.  No.  We -- we -- we

4   traditionally did not require the family to

5   show the net worth that we needed to write

6   the policy because it was rare for them to

7   actually have such a net worth.

8        Q    And it's also true that you don't

9   have any reason to believe that Eli

10  Inzlicht-Sprei was involved in -- in any

11  way in the creation of that document, true?

12       A    That is -- that is correct, yes.

13       Q    Thank you.

14            In connection with the Sara Sprei

15  Family Trust, you were asked earlier who

16  drafted it.  Leaving aside who drafted it,

17  you understood that there was a trust that

18  was the owner of the policy when the policy

19  was originally procured, correct?

20       A    Yes.

21       Q    And is it also true that the

22  agreement that you -- "you" meaning

23  Signature Capital had, that's reflected by

24  Exhibit 40, that Signature Capital

25  controlled the trust, the Sara Sprei Family

Page 183

1              Herman Segal

2    Trust?

3        A    Well, not on paper, but yes, in

4    reality, the trustee took instructions from

5    us, if we needed to -- to take out a

6    paragraph or put in a paragraph or change

7    anything, yes, that is correct.

8        Q    In other words, Signature Capital

9    was managing, controlling, running this

10   entire policy, correct?

11       A    Yes.

12       Q    Just one moment.

13            Now, earlier, in response to

14   questioning by Mr. Paneth, he was asking

15   about documentation that you had and I

16   thought I heard you say that Wells Fargo

17   had access to your documents; is that true?

18       A    Well, the bankruptcy trustee had

19   the copied my computer, so Wells Fargo, I

20   told Wells Fargo that they can get it from

21   him and -- yes, it is true.

22       Q    Okay.  And -- and when did you

23   have this -- well, strike that.

24            Who at Wells Fargo did you have

25   this communication with about contacting

Page 193

1
2                    C E R T I F I C A T I O N
3
4    STATE OF NEW YORK    )
                          : ss.:
5    COUNTY OF NEW YORK   )
6
7         I, BRITTANY SALINE, a Notary Public for and
8    within the State of New York, do hereby certify:
9         That the witness whose testimony as herein
10   set forth was duly sworn by me.
11        I further certify that I am not related to
12   any of the parties to this action by blood or
13   marriage, and that I am in no way interested in
14   the outcome of this matter.
15        IN WITNESS WHEREOF, I have hereunto set my
16   hand this 27th day of December, 2017.
17
18                    *Brittany Saline*
19                    BRITTANY SALINE
20
21
22
23
24
25