Page 1

1

2 IN THE UNITED STATES DISTRICT COURT
  FOR THE EASTERN DISTRICT OF NEW YORK
3 Docket No.: 1:16-cv-5171 (PKC)(RML)
  - - - - - - - - - - - - - - - - - - - - - - x
4 THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,
5                      Plaintiff,
6            - against -
7 ELI INZLICHT-SPREI, individually, as trustee
  and/or beneficiary of the SARA SPREI FAMILY
8 TRUST, and as Executor of the ESTATE OF SARA
  SPREI; AVI ROSENFELD, as trustee of the SARA
9 SPREI FAMILY TRUST; ALAN RUBENSTEIN, as
  trustee of the SARA SOREI FAMILY TRUST; and
10 WELLS FARGO BANK, N.A.,
11                     Defendants.
   - - - - - - - - - - - - - - - - - - - - - - x
12 WELLS FARGO BANK, N.A.,
13                     Cross-Claim Plaintiff,
14            - against -
15 ALAN RUBENSTEIN, as trustee of the SARA
   SPREI FAMILY TRUST,
16
                       Cross-Claim Defendant.
17 - - - - - - - - - - - - - - - - - - - - - - x
18                     90 Park Avenue
                       New York, New York
19                     December 12, 2017
                       11:32 a.m.
20

21      VIDEOTAPED DEPOSITION of HERMAN SEGAL, taken
22 before Brittany Saline, a Professional Shorthand
23 Reporter and Notary Public of the State of New
24 York, pursuant to the Federal Rules of Civil
25 Procedure.

```
                                              Page 2

 1
 2   A P P E A R A N C E S :
 3   KROLL LAW CORPORATION
     Attorneys for Defendant ELI INZLICHT-SPREI
 4   629 State Street
     Santa Barbara, California 93101
 5   BY:  GERALD L. KROLL, ESQ. (Via telephone)
 6
 7   ROBERT R. VIDUCICH, ESQ.
     Attorneys for Defendant ELI INZLICHT-SPREI
 8   110 Wall Street
     New York, New York 10005
 9   BY:  ROBERT R. VIDUCICH, ESQ. (Via telephone)
10
11   PANETH & O'MAHONY, PLLC
     Attorneys for ALAN RUBENSTEIN, as Trustee of the
12   SARA SPREI FAMILY TRUST
     2329 Nostrand Avenue, Suite M-300
13   Brooklyn, New York 11210
     BY:  MICHAEL PANETH, ESQ.
14
15
     ALSTON & BIRD, LLP
16   Attorneys for Defendant and Cross-Claim Plaintiff
     WELLS FARGO BANK, N.A.
17   90 Park Avenue
     New York, New York 10016
18   BY:  THEODORE J. SAWICKI, ESQ.
          MELISSA GWOREK, ESQ.
19        COURTNEY E. QUIRÓS, ESQ.
20
21   ALSO PRESENT:
22   TOM DEVINE, Videographer
23
24
25
```

Page 3

1

2                    S T I P U L A T I O N S

3              IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective parties

5    hereto, that the filing, sealing and certification

6    of the within deposition shall be and the same are

7    hereby waived;

8          IT IS FURTHER STIPULATED AND AGREED  that all

9    objections, except as to form of the question,

10   shall be reserved to the time of the trial;

11         IT IS FURTHER STIPULATED AND AGREED that the

12   within deposition may be signed before any Notary

13   Public with the same force and effect as if signed

14   and sworn to before the Court.

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 29

 1                        Herman Segal
 2        Q     And what was the commission
 3   payable to the insurance agent on a
 4   20 million-dollar policy with the first
 5   year premium of about $1 million?
 6        A     It would be close to 100 percent.
 7        Q     Or a million dollars?
 8        A     Yes.
 9        Q     And in this case, was your son,
10   William Segal, the insurance agent on the
11   Sara Sprei policy?
12        A     Yes, he was.
13        Q     Does that mean that he was due
14   the million dollars in commissions that
15   were generated from the sale -- or the
16   issuance of the policy?
17        A     No.  We used Signature Capital as
18   the entity that would get the commission.
19        Q     Okay.  Now, as part of -- of --
20   you indicated that the family of the
21   insured would have to be onboard for the
22   entire transaction.
23              Does that mean that they were
24   made aware that the policy would be sold
25   after the two-year period and had to agree
```

```
                                                    Page 30
 1                       Herman Segal
 2    to that concept?
 3          A    Well, they always had the right
 4    to keep the policy, if they wanted to, but
 5    that would --
 6                MR. SAWICKI:  Go off the record
 7          again.
 8                THE VIDEOGRAPHER:  The time now
 9          is approximately 12:04.  We're going
10          off the record.
11                (Discussion was held off the
12          record.)
13                THE VIDEOGRAPHER:  The time is
14          12:07 p.m.  We're back on the record.
15    BY MR. SAWICKI:
16          Q    Thank you.  Mr. Segal, you
17    indicated that the family had the right to
18    keep the policy.  Was the initial concept
19    that -- strike that.
20                Was it contemplated that the
21    family would be paying the initial premium
22    as part of the issuance of this large life
23    insurance policy?
24          A    If they did, they would be
25    reimbursed relatively quickly, but no,
```

Page 31

1                         Herman Segal
2     usually they would not make the premium in
3     the sense that they would risk any money.
4          Q    Okay.  What was the source of the
5     funding for the initial premium?
6          A    Depending on the carrier and
7     depending on the situation, usually, we
8     would use Himelsein and Mandel to fund the
9     policies.
10         Q    Is one of their entities known
11    as -- or called HM Ruby?
12         A    Yes, that was the entity that was
13    used.
14         Q    Okay.  If the family decided that
15    they did not want to keep the policy after
16    its issuance, was it contemplated that the
17    family would be personally responsible for
18    any of the insurance premiums between the
19    time of issuance and the sale of the
20    policy?
21         A    No, of course not.  There was a
22    put option that was simultaneously executed
23    with the loan documents and the put option
24    allowed the family or the trustee to give
25    up the policy to the HM Ruby Fund and the

Page 40

1              Herman Segal
2    misrepresentations on the application?
3        A    Well, there was the methodology
4    that they used, but the primary target was
5    policies that they suspected lacked
6    insurable interest, so they would challenge
7    assets, they would challenge the questions
8    where the answer would be that the policy
9    was not financed and et cetera.
10        Q    Did you and your entities,
11    including Signature Capital Group,
12    participate in the making of
13    misrepresentations about insured's assets
14    or the source of funding for the policies
15    when you were procuring those policies
16    during that 2007 to 2010 time frame?
17        A    I plead the Fifth on that.
18        Q    All right.  I identified for you
19    the fact that this case is about the
20    20 million-dollar Lincoln National policy
21    on the life of a woman named Sara Sprei.
22            Did you know her personally?
23        A    I did not.
24        Q    Did you know her son, Dr. Eli
25    Inzlicht-Sprei?

```
                                              Page 42
 1                    Herman Segal
 2             (One-page handwritten agreement
 3         previously marked for identification
 4         as Exhibit 40 on 10/20/17.)
 5         Q    Mr.  -- Mr. Segal, Exhibit No. 40
 6  is a handwritten agreement that Dr. Eli
 7  Inzlicht-Sprei has already testified that
 8  he entered into and signed.
 9             Is that your signature on the
10  bottom of this one-page agreement?
11         A    It appears so, yes.
12         Q    Did you enter into this agreement
13  with Mr.  -- with Dr. Eli Inzlicht-Sprei on
14  or about April of 2008?
15         A    Apparently I did.
16         Q    And was this an agreement related
17  to the Lincoln National policy on Ms. Sara
18  Sprei?
19         A    Yes, it was.
20         Q    Did you agree with
21  Dr. Inzlicht-Sprei as it says in No. 1 that
22  the premium payments for that policy will
23  be made by Signature Capital whether
24  directly or through third parties?
25         A    Yes.
```

```
                                         Page 43
 1                    Herman Segal
 2        Q     Did you also agree that the
 3   trustee would be agreed to in advance by
 4   both parties?
 5        A     Yes.
 6        Q     And is that the trustee for the
 7   life insurance trust that would be the
 8   owner of the policy?
 9        A     Yes.  The trustee of the trust
10   that owned the policy, yes.
11        Q     Did you also agree with
12   Dr. Inzlicht-Sprei, as it says in No. 3,
13   that upon the sale of the policy or the
14   death of the insured, 5 percent of the
15   gross proceeds would go to the doctor and
16   the remaining 95 percent will go to
17   Signature Capital?
18        A     That's what it says, but there
19   were other things that were understood that
20   weren't necessarily listed --
21        Q     What other things?
22        A     He was a client of Spiegel, I did
23   not know him until the policy was already
24   written or was about to be written or was
25   already in effect, so to speak.  He wanted
```

Page 44

1                    Herman Segal

2    something in writing, most people did not.

3    Most agreements were done just by

4    handshake.

5              So it does say 5 percent, but the

6    understanding was that if there was a

7    sudden death and they actually paid out,

8    that he would get 10 percent.

9        Q    So if Mr. Sara Sprei died and

10   $20 million were paid out, you had an

11   understanding that Dr. Inzlicht-Sprei, that

12   he would get $2 million and Signature

13   Capital would get $18 million?

14       A    That's correct.

15       Q    But in the -- according to this

16   agreement, in the event of the sale of the

17   policy, prior to Ms. Sprei's death, did

18   this paragraph 3 control that is that

19   Dr. Inzlicht-Sprei was -- was supposed to

20   get 5 percent of the proceeds of the sale

21   of the policy and 95 percent would go to

22   Signature Capital?

23       A    No.  He certainly would have had

24   the right to make a decision as to what he

25   wanted the policy to go forward if -- in

Page 45

1                    Herman Segal
2    other words, if, for example, we were
3    lapsing the policy, he would have the right
4    to say don't lapse it, I will pay it going
5    forward.  If he was selling it, he would
6    have the right to say let me buy it,
7    et cetera.
8          Q    Okay.
9          A    And that's not anywhere in this
10   agreement.
11         Q    Are you saying it was
12   contemplated that he would be informed as
13   to what Signature Capital intended to do
14   with the policy and given them the option
15   to take it over or --
16         A    Yes.  The understanding was that
17   on all of our clients that they had input
18   after two years what we would do with it.
19         Q    Okay.  The next paragraph in this
20   agreement, Exhibit 40, says that nothing
21   obligates Signature Capital to maintain the
22   policy, however, should they -- and the
23   "they" being Signature Capital -- elect to
24   lapse the policy, Signature Capital will
25   pay Dr. Inzlicht-Sprei $50,000 as

```
                                            Page 50
 1                  Herman Segal
 2    about the specifics, so no, I'm sure that
 3    they did not.
 4         Q     Was Mr. Avi Rosenfeld one of the
 5    lawyers that Signature Capital used from
 6    time to time for these life insurance
 7    policy transactions?
 8         A     Yes, he was.
 9         Q     Do you know whether Mr. Rosenfeld
10    was the drafter of this trust agreement
11    form?
12         A     I have no idea.
13         Q     Turning to page 16 of the
14    agreement, Exhibit No. 48.
15         A     (Complying.)
16         Q     Do you recognize Mr. Avi
17    Rosenfeld's signature on that page?
18         A     I'm no handwriting expert.
19         Q     Page 16.
20         A     (Perusing.)  It looks like it
21    might be his signature.
22         Q     While we have the agreement in
23    front of us, let's turn to the last two
24    pages of -- the second-to-last page is
25    entitled Resignation and Appointment of
```

1                    Herman Segal

2    Trustee.

3              Do you know whether Mr. Avi

4    Rosenfeld resigned as trustee as of

5    August 18th, 2010 and Alan Rubenstein was

6    substituted in as a trustee for this Sara

7    Sprei Family Life Insurance Trust?

8         A    I have no idea.

9         Q    Do you have any understanding as

10   to why this may have been done in 2010?

11        A    I do, but I don't want to rely or

12   say negative things about anyone, so I will

13   not.

14        Q    Doesn't sound like a privilege

15   matter, so I ask that you go ahead and

16   answer the question, please?

17        A    Well, Avi Rosenfeld was a more --

18   was less likely to cooperate, so I assume

19   that's why he was replaced, that's what

20   indeed happened.

21        Q    By "less likely to cooperate,"

22   what do you mean?

23        A    Less likely to cooperate on what

24   needed to be done to what was eventually

25   done with the policy.

Page 52

1                    Herman Segal

2       Q      Does it involve the timely

3   payment of premiums or the -- or the

4   signature of sale documents or something

5   else?

6       A      Well, it involved signatures or

7   involving the sale in its entirety.

8       Q      Okay.

9       A      And if there were any proceeds,

10  the distribution thereof.

11      Q      Okay.  And in 2010, were you and

12  Signature Capital acquainted with Alan

13  Rubenstein?

14      A      Yes, we were.

15      Q      Was he another one of the

16  attorneys that Signature Capital used from

17  time to time to be trustee of these life

18  insurance trusts for the life insurance

19  transactions?

20      A      Yes, he was.

21      Q      And was it your view that he --

22  that Mr. Rubenstein was someone who was --

23  was and would be more cooperative

24  concerning the sale transactions than Avi

25  Rosenfeld?

```
                                            Page 53
 1                    Herman Segal
 2        A      Well, there came a point in time
 3    when there was friction between the
 4    Spiegels and the Segals and at that point
 5    there were -- there was basically a
 6    dissolution of the partnership, there was
 7    acrimony, there was animosity, and Mr. Alan
 8    Rubenstein had allied himself or at least
 9    not openly, but was my feeling that his
10    loyalties was with the Spiegels.
11              MR. SAWICKI:  Okay.  Gerry, we're
12        going to go to Exhibit No. 28.
13        (handing).
14              MR. KROLL:  Thank you.  Can you
15        give me a date, Todd.
16              MR. SAWICKI:  April 1, 2008.
17              MR. KROLL:  Got it.  Thank you.
18              (One-page letter dated 4/1/08
19        previously marked for identification
20        as Exhibit 28 on 9/28/17.)
21        Q    Mr. Segal, I put in front of you
22    Exhibit No. 28.
23              Is this a document that appears
24    on what was Signature Capital Group's
25    letterhead in 2008?
```

```
                                        Page 87

 1                   Herman Segal

 2       A     Yes, I believe that's his current

 3    telephone number.

 4       Q     And his e-mail, right?

 5       A     Yes, that's one of his emails.

 6       Q     So as this document indicates,

 7    this was -- these forms were filled out in

 8    September 2010.

 9             Does this refresh your memory

10    that this Sara Sprei Lincoln National

11    policy was sold to Berkshire Settlements in

12    a life settlement transaction in or about

13    September/October 2010?

14       A     Well, as recently as several

15    months ago, I had no recollection of this

16    policy being sold at all and I was made

17    aware of some of these e-mails that I was

18    somehow involved and I was made aware of

19    these e-mails by people who wanted me to

20    try to put pressure on Dr. Inzlicht to walk

21    away from this case.  And at that time, I

22    actually suspected that they were

23    forgeries.

24             However, since then, it's come to

25    my -- not through memory, but just from
```

```
                                            Page 90

 1                    Herman Segal
 2   one of those people that would prefer that
 3   this case go away and is telling me to do
 4   what I can to make it go away.
 5        Q     Who else besides your son was
 6   pressuring you?
 7        A     Well, everyone involved with the
 8   case.
 9        Q     Please give me some names.
10        A     Alan Rubenstein, Avi Rosenfeld,
11   the Spiegels, not directly, but through
12   intermediaries.
13        Q     Who were the Spiegels'
14   intermediaries?
15        A     Different people.
16        Q     Please give me names.
17        A     Well, there were people who I
18   hadn't known before and I don't know if the
19   names were real names or made-up names.
20   There were some anonymous texts that I
21   received with threats.
22        Q     What names were you given whether
23   you knew them before, whether you knew they
24   were correct names or not?
25        A     I was given a name of Aaron
```

```
                                          Page 156
```

1                          Herman Segal

2      policy with him because it was Mr. Spiegel

3      that had brought him in and he was the one

4      that dealt with him.

5          Q    But you were talking to Dr. Sprei

6      about other things during that time period,

7      correct?

8          A    Yes.

9          Q    So -- and in fact, you used him

10     as a doctor, right?

11         A    Yes.

12         Q    So when you were visiting him,

13     there was never a time that

14     Dr. Inzlicht-Sprei turned to you and asked

15     you what the status of the policy was or if

16     you had considered selling the policy or

17     anything else?

18         A    No.  I told him what I believed

19     was the truth at the time, which was that

20     the policy was being foreclosed on and it

21     didn't look like there was anything that

22     could be done, but perhaps the lender would

23     pay a few dollars just to have a smooth

24     transition to hand the policy over, which

25     is what the Spiegels had told me.

1                    Herman Segal

2    to make premiums on or we were being

3    squeezed by our lender to hand them over,

4    so we had a ticking time bomb situation, we

5    would lose the policies.

6        Q    We talked earlier about a

7    handwritten agreement that you had with

8    Dr. Inzlicht-Sprei, correct?

9        A    Yes.

10       Q    Now, you mentioned that there was

11   something that was not actually written in

12   that agreement, which was that -- but it

13   was part of the deal that he was supposed

14   to get 10 percent upon death instead of

15   5 percent, right?

16       A    Yes.

17       Q    Was there anything else that you

18   had agreed with Dr. Inzlicht-Sprei about

19   that was not embodied in that agreement?

20       A    Well, we basically had an

21   understanding that he would get some profit

22   out of this, that he wasn't just doing this

23   just for our benefit, that he was supposed

24   to benefit from this.

25       Q    Was there anything else that's

Page 159

1                    Herman Segal

2   not included in that written agreement that

3   was part of your deal with

4   Dr. Inzlicht-Sprei?

5        A    No.  Like I said, you know, an

6   understanding that before the policy would

7   be, I guess, gotten rid of however it was,

8   that he would have a right to see if he had

9   any interest in buying it, to see if he

10  thought it paid to salvage it.

11            I wasn't, you know, that aware of

12  what his mother's health was at the time.

13        Q    So at the time that you believed

14  Alan Spiegel would be trying to sell the

15  policy, did you ever discuss with Dr. Sprei

16  whether he wanted to try to take the policy

17  back himself?

18        A    Again, the Spiegels were the ones

19  who were dealing with him because they --

20  they had brought him in, they had basically

21  been the procurers of that policy, plus

22  they were involved with HM Ruby and they

23  were the ones who were selling policies, so

24  they were more intimately aware of the

25  circumstances.

Page 171

1                     Herman Segal

2        A     Well, I don't have much of a

3    recollection.  But in the recesses of my

4    mind, at that point, I believe the policy

5    had been, I guess, disposed of and that he

6    had the funds.

7        Q     Did you know of any reason why he

8    would have the funds?

9        A     I don't know if I knew that he

10   had become the trustee or if he had somehow

11   gotten them, no, I do not.

12       Q     Okay.  So when you learned at the

13   time that the policy had been disposed of,

14   did you have a discussion with Dr. Inzlicht

15   about that?

16       A     No.

17       Q     Is there a reason why you never

18   called him?

19       A     Yes.

20       Q     And what was that reason?

21       A     Because I was not going to be put

22   in a position where I would have to lie to

23   him.

24       Q     Did Signature Capital Group have

25   a bank account at Santander Bank?

```
                                        Page 181

  1                    Herman Segal

  2        Q     -- it's --

  3        A     Can you give me some --

  4        Q     -- it's a statement -- it's

  5   statement of net worth, Sara Sprei Family

  6   Statement of Net Worth as of December 31,

  7   2007.

  8        A     Can you give me some exhibits

  9   surrounding it so I should be able to find

 10   it?

 11              MR. KROLL:  Can the reporter show

 12        the witness Exhibit 44, please.

 13        It's --

 14              MR. SAWICKI:  It should be

 15        relatively early in the deposition.

 16        A     I got it.  Thank you.

 17        Q     Okay.  Thank you.

 18              Just take a look -- you were

 19   asked earlier by counsel about this

 20   document, which purports to be some type of

 21   statement of net worth with the Sprei

 22   family as of that date.

 23              It's true, sir, that you don't

 24   have any reason to believe that Sara Sprei

 25   was involved in creating this document, do
```

1                    Herman Segal

2    you?

3         A    No.   No.   We -- we -- we

4    traditionally did not require the family to

5    show the net worth that we needed to write

6    the policy because it was rare for them to

7    actually have such a net worth.

8         Q    And it's also true that you don't

9    have any reason to believe that Eli

10   Inzlicht-Sprei was involved in -- in any

11   way in the creation of that document, true?

12        A    That is -- that is correct, yes.

13        Q    Thank you.

14             In connection with the Sara Sprei

15   Family Trust, you were asked earlier who

16   drafted it.  Leaving aside who drafted it,

17   you understood that there was a trust that

18   was the owner of the policy when the policy

19   was originally procured, correct?

20        A    Yes.

21        Q    And is it also true that the

22   agreement that you -- "you" meaning

23   Signature Capital had, that's reflected by

24   Exhibit 40, that Signature Capital

25   controlled the trust, the Sara Sprei Family

1                    Herman Segal

2   Trust?

3        A    Well, not on paper, but yes, in

4   reality, the trustee took instructions from

5   us, if we needed to -- to take out a

6   paragraph or put in a paragraph or change

7   anything, yes, that is correct.

8        Q    In other words, Signature Capital

9   was managing, controlling, running this

10  entire policy, correct?

11       A    Yes.

12       Q    Just one moment.

13            Now, earlier, in response to

14  questioning by Mr. Paneth, he was asking

15  about documentation that you had and I

16  thought I heard you say that Wells Fargo

17  had access to your documents; is that true?

18       A    Well, the bankruptcy trustee had

19  the copied my computer, so Wells Fargo, I

20  told Wells Fargo that they can get it from

21  him and -- yes, it is true.

22       Q    Okay.  And -- and when did you

23  have this -- well, strike that.

24            Who at Wells Fargo did you have

25  this communication with about contacting