UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                           16-CV-5171 (PKC) (RML)

          - against -

ELI INZLICHT-SPREI, individually, as trustee
and/or beneficiary of the Sara Sprei Family
Trust, and as Executor of the Estate of Sara
Sprei; WELLS FARGO BANK, N.A.; and LSH
CO, as intervenor,

                              Defendants.
--------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

       This interpleader action involves competing claims for a $20 million life insurance policy

(the "Policy") issued by Plaintiff The Lincoln National Life Insurance Company on the life of Sara

Sprei.  Current interpleader defendants are Eli Inzlicht-Sprei, in his personal capacity, as current

Trustee of the Sara Sprei Family Trust (the "Trust"), and as executor of Sara Sprei's estate; Wells

Fargo Bank N.A; and LSH CO.[1]  Defendants Wells Fargo and Inzlicht-Sprei now each move for

summary judgment asserting that they are entitled to all the Policy proceeds.  Inzlicht-Sprei also

seeks summary judgment on LSH CO's breach of contract and indemnification claims against him.

Finally, LSH CO seeks summary judgment on Inzlicht-Sprei's cross-claim against it for inducing

and aiding and abetting a breach of fiduciary duty.  For the reasons stated below, Wells Fargo's

and LSH CO's motions are granted in their entirety, and Inzlicht-Sprei's motion is denied.

_____

[1] LSH CO joined this action via a motion to intervene.  (*See* Sept. 13, 2018 Minute Order.)

1

# BACKGROUND

## I.    Relevant Facts[2]

In 2008, Sara Sprei, who was 84-years-old at the time, and her son, Dr. Eli Inzlicht-Sprei[3], working with various employees and associates of Signature Capital, procured the Policy, a $20 million life insurance policy on Sara Sprei's life.[4]   (*See* Wells Fargo Bank N.A. 56.1 Statement ("Wells Fargo 56.1"), Dkt. 119-2, ¶¶ 26–27, 84.)  Signature Capital was founded by Herman Segal for the primary purpose of writing insurance policies.  (*Id.* ¶¶ 16, 18.)  His son, William Segal, was an insurance agent for Signature Capital.  (*See id.* ¶¶ 14, 16.)  Brothers Steven and Alan Spiegel frequently collaborated with Signature Capital on various endeavors including the purchase, maintenance, and sale of insurance policies.  (*Id.* ¶ 26.)  Signature Capital had a reputation for writing high-value insurance policies for elderly clients.  (*Id.* ¶ 19.)  Their business model ensured that the insured and his or her family would not be responsible for paying the premiums on these

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 Statement or 56.1 Counterstatement denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to a party's 56.1 Statement, Response, or Counterstatement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 Statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.") (emphasis in original).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

[3] Inzlicht-Sprei is a medical doctor whose office is in located in New York City.  (*See* Wells Fargo 56.1, Dkt. 119-2, ¶ 66.)

[4] The parties dispute the extent of Sara Sprei's involvement in procuring the Policy.  (*See, e.g.*, Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶¶ 26, 139.)  However, for the reasons discussed *infra*, the Court does not need to resolve this dispute.

high-value policies.  (*Id.* ¶ 22.)  Instead, Signature Capital would be responsible for the premiums themselves, typically arranging for premium financing with H.M. Ruby, L.P., with the aim of selling the policy after the two-year contestability period expired.[5]  (*Id.* ¶¶ 21, 24.)  As part of this scheme, the insurance policy was typically owned by a trust in the name of the insured, with a member of the insured's family listed as the beneficiary of the trust.  (*Id.* ¶ 23; *see also* Deposition of Herman Segal ("Herman Segal Dep."), Dkt. 120-2, at 32:3–17.)  Most of the time, these types of agreements between Signature Capital, on the one hand, and the insured and his/her family, on the other hand, were "done just by handshake."  (Wells Fargo 56.1, Dkt. 119-2, ¶ 25.)

### A.    The Scheme

Here, though Inzlicht-Sprei entered into a handwritten (versus a hand-shake) agreement (the "Agreement") with Signature Capital, the terms of that Agreement largely followed Signature's typical practices.  For example, the Agreement, dated April 28, 2008, provided that Signature Capital would pay all of the premiums for the Policy either directly or through third parties.  (The Agreement, Dkt. 120-33.)  The Agreement also gave Signature Capital the right to sell the Policy at any time.  (*Id.*)  Finally, it provided that, in the event of the sale of the Policy or Sara Sprei's death, Inzlicht-Sprei would receive 5% of the Policy's gross proceeds.[6]  (*Id.*)  The Agreement also noted that Signature Capital was under no obligation to maintain the Policy and that if the Policy lapsed, Inzlicht-Sprei would be paid $50,000 "as compensation."  (*Id.*)  Inzlicht-Sprei does not dispute that he signed the Agreement, but asserts that he had a verbal agreement

---

[5] There is no market for life insurance policies for the first two years after they are issued because carriers have the option to contest the validity of the policy during that time period.  (Wells Fargo 56.1, Dkt. 119-2, ¶ 20.)

[6] The Agreement does not specify in what role Inzlicht-Sprei was claiming this money, *i.e.*, individually or as the beneficiary of the Trust.  The Agreement states that Inzlicht-Sprei signed the Agreement "for the family."  (The Agreement, Dkt. 120-33.)

with Herman Segal that superseded the Agreement. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 29.) Specifically, Inzlicht-Sprei asserts that, pursuant to this oral agreement, he was entitled to 10%, rather than 5%, of the Policy proceeds in the event of sale of the Policy or Sara Sprei's death, and that he also would have the first right to buy the Policy before Signature Capital sold it to a third party. (*Id.*)

The Sprei Family and Signature Capital established the Trust to own the Policy on March 28, 2008. (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 23, 52; *see also* Herman Segal Dep., Dkt. 120-2, at 182:14–20.) The Trust Agreement was executed in New York. (Wells Fargo 56.1, Dkt. 119-2, ¶ 53.) The Trust Agreement was drafted by Avi Rosenfeld, a lawyer licensed in New York, who was designated as the Trustee. (*Id.* ¶¶ 42–43, 47.) Though Rosenfeld initially specified New York as the location of the Trust, he changed the location to New Jersey at the behest of Signature Capital, which informed Rosenfeld that "they [Signature Capital] need[ed] a New Jersey trust." (*Id.* ¶¶ 48–49; *see also* Dkt. 120-87.) However, despite the Trust's stated location, Rosenfeld did not know if any activity related to the Trust occurred in New Jersey. (Wells Fargo 56.1, Dkt. 119-2, ¶ 57.) The Trust Agreement permitted the designation of more than one Trustee (*see* Trust Agreement, Dkt. 120-75, at 7) and gave the Trustee numerous powers, including the power "[t]o sell . . . or otherwise dispose of such [Trust] property at public or private sale, for cash or on credit, and upon such terms and agreements as they may see fit" (*id.* at 8). The Trustee was also authorized to "borrow money and to pledge or mortgage any such property upon such terms and arrangements as they deem proper." (*Id.*) Finally, the Trust Agreement noted that the Trustee "shall have full and complete discretion in the exercise of the powers given to them, and their determination as to matters left to their judgment or decision shall, to the extent permitted by law, be final and conclusive on all persons . . . ." (*Id.* at 10.) Inzlicht-Sprei was listed as the sole

beneficiary of the Trust. (Wells Fargo 56.1, Dkt. 119-2, ¶ 8.) Despite being listed as the beneficiary, Inzlicht-Sprei never asked for information about the Trust, and disputes that he was aware that there was a Trustee. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶¶ 40–41.)

On or about March 25, 2008, around the same time the Trust was created, an application for life insurance was submitted to Lincoln (the "Application"), listing Sara Sprei as the proposed life insured and the Trust as the proposed owner and beneficiary of the Policy. (*Id.* ¶ 58.) In support of the Application, Sara Sprei underwent a medical examination in New York. (*Id.* ¶ 65.) The Application represented that Sprei had a total net worth of $48,450,000. (*Id.* ¶ 60; *see also* The Application, Dkt. 120-69, at 1a.) Inzlicht-Sprei disputes that Sara Sprei had anything to do with providing the information about her and her family's net worth to Lincoln, asserting that Sara Sprei signed the Application before any information was filled in. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶¶ 60, 62–63.) The Application also asked whether the "proposed insured," *i.e.*, Sara Sprei, would (1) receive any compensation if the insurance policy was issued; (2) had discussed selling or assigning the policy to another entity, such as a trust; and (3) whether the insurance policy would be funded via a premium funding loan or other third-party funds. (Wells Fargo 56.1, Dkt. 119-2, ¶ 59; *see also* The Application, Dkt. 120-69, at 1a.) The Application responded "no" to all three questions. (Wells Fargo 56.1, Dkt. 119-2, ¶ 59; *see also* The Application, Dkt. 120-69, at 1a.) Though the Application states that it was signed in New Jersey (The Application, Dkt. 120-69, at 8), there is no evidence that any of the signatories to the Application, *i.e.*, Sara Sprei, Avi Rosenfeld, or William Segel, signed the Application or other relevant documents in New Jersey. Inzlicht-Sprei, for example, stated that he has no knowledge of Sara Sprei traveling to New Jersey around the time the Application was signed. (Wells Fargo 56.1, Dkt. 119-2, ¶ 82.) Rosenfeld testified that he had not signed any of the Application documents in New Jersey, was

not aware of any meetings related to the Application occurring in New Jersey, and did not recognize the handwriting on a form that noted that the Application was executed in New Jersey. (*Id.* ¶ 81.) Likewise, though William Segal did not remember whether he was in New Jersey when the Application was signed (*id.* ¶ 77), he testified that he met with Inzlicht-Sprei to discuss the Application at Signature Capital's New York Office (*id.* ¶ 69–70; *see also* Deposition of William Segal ("William Segal Dep."), Dkt. 120-10, at 54:13–19.)[7]

Lincoln issued the Policy on April 29, 2008. (Wells Fargo 56.1, Dkt. 119-2, ¶ 84.) Signature Capital, consistent with the terms of the Agreement, provided the funds to pay the first premium payment, and thereafter worked to find third-party funders for the insurance premiums. (*Id.* ¶¶ 88, 90–94, 98–99.) In August 2008, Signature Capital entered into a financing arrangement with H.M. Ruby to secure a loan to pay the premiums in exchange for H.M. Ruby receiving a security interest in the Policy. (*Id.* ¶¶ 100–02.) Sara Sprei signed two forms in connection with the H.M. Ruby premium financing transaction.[8] (*Id.* ¶ 103.) In April and July 2010, the Policy was at risk of lapsing for failure to make the premium payments. (*Id.* ¶¶ 116, 123.) In April 2010, Signature Capital secured additional funding from H.M. Ruby to make the overdue premium

---

[7] Inzlicht-Sprei does not dispute that there was one meeting regarding the Policy or that the meeting occurred in New York. (Declaration of Inzlicht-Sprei ("Inzlicht-Sprei Dec."), Dkt. 139-2, ¶ 9.) In his 56.1 Response, he notes that William Segal was on painkiller medication around the time that the Application was being signed and that "[h]is memory was fuzzy during that time period." (Inzlicht-Sprei's 56.1 Response, Dkt. 139-1, ¶¶ 69–70.) However, without specific evidence contesting the location of William Segal's meeting with Inzlicht-Sprei, the Court does not find that William Segal's testimony regarding his ability to recall facts from this time period is sufficient to create a material dispute of fact over where the Policy was signed; the credible evidence establishes that it was signed in New York.

[8] Though the parties dispute whether, by executing these forms, Sara Sprei actually disclaimed any interest in the Policy proceeds for her and her heirs (*see* Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 104), the Court does not find that this dispute is relevant. However, the Court notes that Inzlicht-Sprei does not dispute that Sara Sprei did, in fact, sign these documents. (Deposition of Dr. Eli Inzlicht-Sprei ("Inzlicht-Sprei Dep."), Dkt. 120-8, at 81:24–83:13.)

payments. (*Id.* ¶¶ 119–121.) As was Signature Capital's practice, all of the premium payments to Lincoln were made through the Trust account relying on funding from third parties, like H.M. Ruby. (*Id.* ¶¶ 24, 99, 107, 110, 122, 125; *see also* Dkt. 120-84.) Similarly, in August 2010, the Trust made additional payments to keep the Policy from lapsing.[9] (*Id.* ¶ 125.) However, at the same time, Signature Capital also began trying to sell the Policy. (*Id.* ¶¶ 135, 137.)

Also, in August 2010, Signature Capital asked Rosenfeld to resign as Trustee. (Deposition of Avi Rosenfeld ("Rosenfeld Dep."), Dkt. 129-5, at 88:4–15.) Rosenfeld believed that "[his] resignation was requested because someone thought that I would have been too honest to engage in this type of activity." (*Id.* at 89:17–20.) Rosenfeld agreed to resign and memorialized his resignation in a Resignation and Appointment of Trustee document (the "Trustee Resignation"). (*Id.* at 66:7–13; *see also* Trustee Resignation, Dkt. 120-81.) The Trustee Resignation contains signatures for the outgoing and incoming Trustees and Sara Sprei. (Trustee Resignation, Dkt. 120-81.) Inzlicht-Sprei, however, asserts that it is not his mother's signature on the Trustee Resignation. (Inzlicht-Sprei Dep., Dkt. 129-8, at 54:7–12.) Though Rosenfeld signed the Trustee Resignation on or around September 5, 2010 (Rosenfeld Dep., Dkt. 129-5, at 66:17–20), the Trustee Resignation stated that it was effective on August 18, 2010 (Trustee Resignation, Dkt. 120-81). Alan Rubenstein, who frequently worked with Signature Capital, was appointed the Successor Trustee. (*See* Declaration of Avi Rosenfeld ("Rosenfeld Dec."), Dkt. 120-88, ¶¶ 6, 16; Declaration of Alan Rubenstein ("Rubenstein Dec."), Dkt. 119-16, ¶ 2.) Rubenstein does not remember when he signed the Trustee Resignation, but testified that it was "probably" on August 18, 2010. (Deposition of Alan Rubenstein ("Rubenstein Dep."), Dkt. 129-7, at 39:9–25.) When

---

[9] It is unclear where this additional funding came from. In general, Rosenfeld would tell Signature Capital that the Policy was at risk of lapsing and then rely on Signature Capital to procure the additional funds. (Wells Fargo 56.1, Dkt. 119-2, ¶ 118.)

he signed it, Sara Sprei's purported signature was already on the Trustee Resignation.  (*Id.* at 32:21–23.)  Rubenstein also confirmed with Rosenfeld that he had signed the document as well.  (*Id.*, Dkt. 120-7, at 135:3–19.)

The Trust Agreement states that "[a]ny Trustee may resign at any time delivering or mailing a notice in writing of such resignation to the others then acting, or, if none, to his designated successor, if such designee has indicated his willingness to act, and thirty days thereafter such resignation shall take effect."  (Trust Agreement, Dkt. 120-75, at 6.)  Rubenstein understood that, by signing the Trustee Resignation, he would become a Trustee immediately.  (*See* Rubenstein Dep., Dkt. 120-7, at 158:12–17.)  Specifically, he understood that he would be a co-Trustee for thirty days until Rosenfeld's resignation took effect.  (*See id.*)  On September 20, 2010, Lincoln sent Rubenstein, at his New York address, a confirmation that it had received and processed a change of Trustee for the Trust.  (Wells Fargo 56.1, Dkt. 119-2, ¶ 133.)

### B.    The Sale

When he signed the Trustee Resignation, Rubenstein knew that the Trust was at risk of default on the H.M. Ruby loan, that the Policy would be remitted to H.M. Ruby if the premium financing was not repaid, and that Signature Capital was trying to sell the Policy to address this risk.  (*Id.* ¶¶ 136–37.)  He believed it would be better to get some money for the Trust, rather than nothing.  (Rubenstein Dep., Dkt. 120-7, at 190:17–23 (testifying that he believed that "getting the family something was better than getting them nothing and returning the [P]olicy").)  In September 2010, Berkshire Settlements ("Berkshire") offered a bid to buy the Policy.  (Wells Fargo 56.1, Dkt. 119-2, ¶ 139.)  Berkshire sources life insurance policies for secondary market purchasers.  (*Id.* ¶ 141.)  In response, Alan Spiegel submitted a Viatical Settlement Application and associated documents to Berkshire.  (*Id.* ¶ 142.)  The documents sent by Alan Spiegel had execution dates of September 14 and 15, 2010 (Wells Fargo 56.1, Dkt. 119-2, ¶ 142); however, Berkshire required

that several documents be re-executed, and the re-executed documents had an execution date of September 21, 2010. (*Id.* ¶ 143.) These documents bore the purported signatures of Alan Rubenstein, Sara Sprei, and Inzlicht-Sprei and most were notarized by Nachum Salzman. (Viatical Settlement Application, Dkt. 120-19; *see also* Dkts. 120-20, 120-21, 120-22.) Inzlicht-Sprei asserts that his, Sara Sprei's and the notary's signatures were all forged. (Dr. Eli Inzlicht-Sprei 56.1 Statement ("Inzlicht-Sprei 56.1"), Dkt. 123-2, ¶¶ 15–16; *see also* Inzlicht-Sprei Dep., Dkt. 129-8, at 108:15–110:20.) On September 27, 2010, Lincoln sent a letter to Sara Sprei informing her that the Policy was potentially going to be sold. (*See* Wells Fargo 56.1, Dkt. 119-2, ¶ 150.) Inzlicht-Sprei disputes that he or his mother ever received this document.[10] (Inzlicht-Sprei Dec., Dkt. 139-2, ¶ 19.)

After conducting due diligence,[11] the Trust, represented by Rubenstein, and Berkshire entered into a Viatical Settlement Agreement (the "VSA") where the Trust sold the Policy to Berkshire for $4,365,863. (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 153, 156.) Rubenstein executed the VSA on October 4, 2010 and Berkshire counter-signed on October 7, 2010. (*Id.* ¶ 153.) Inzlicht-Sprei asserts that the signatures of Sara Sprei and the notary are forged on these documents as well. (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶¶ 15–16; Inzlicht-Sprei Dep., Dkt. 129-8, at 132:16–133:2; *see also* Deposition of Nachum Salzman ("Salzman Dep."), Dkt. 129-9, at 12:17–18:3.) The VSA

---

[10] As noted *infra* at n.14, Inzlicht-Sprei's testimony about his mother never having received Lincoln's notice of potential sale, to the extent it is based on her statements to him are hearsay, which makes Inzlicht-Sprei's testimony inadmissible at trial and thus generally not competent evidence for purposes of a summary judgment motion.

[11] Inzlicht-Sprei does not dispute that Berkshire conducted due diligence before buying the Policy, but disputes that the due diligence conducted by Berkshire was adequate. However, Inzlicht-Sprei provides no evidence that the additional due diligence measures he proposes were legally required or standard industry practice. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 144.)

stated that "[the Trust] acknowledges and agrees that the exclusive ownership of the Policy will be transferred to [Berkshire]" and that

> [the Trust] acknowledges that after the closing the Death Benefit of the Policy will be paid to [Berkshire] or its designated beneficiary . . . and [the Trust] will not be entitled to receive payment of any death benefit proceeds, cash value, dividends, guaranteed insurability options, advantages, policy loan, or other benefit provided under the Policy.

(Wells Fargo 56.1, Dkt. 119-2, ¶ 154; *see also* the VSA, Dkt. 120-11, at 8–9, 10.) Of the sale proceeds, $3,163,363 was transmitted directly to H.M. Ruby for repayment of the outstanding premium financing and the remaining $1,200,000 was transmitted to the Trust's new J.P Morgan checking account opened by Rubenstein on September 14, 2010. (*Id.* ¶¶ 157, 160–61.)

Sometime in 2010, Steven Spiegel told Inzlicht-Sprei that the Policy could not be salvaged. (*Id.* ¶¶ 175, 177.) Inzlicht-Sprei asked whether he would be paid pursuant to the Agreement and Spiegel replied that he would receive a "good will payment" of $50,000. (*Id.* ¶¶ 176–77.) On November 23, 2010, at the direction of Spiegel, Rubenstein transferred $50,000 from the Trust's account, to his attorney IOLA account, and then to Inzlicht-Sprei's account.[12] (*Id.* ¶ 179.) The rest of the $1,200,000 was paid to the Segals, Spiegels, and various companies, in part, at least, as commissions for facilitating the sale of the Policy, as well as either $7,500 or $10,000 in trustee fees to Rubenstein. (Rubenstein Dep., Dkt. 129-7, at 69:2–71:23.)

On October 26, 2010, Mills, Potoczak, & Company, which acted as an escrow agent for the sale, sent Lincoln a Life Ownership Change Form and a Life Beneficiary Name Change Form requesting that the ownership of the Policy be changed from the Trust to Wells Fargo.[13] (Wells

---

[12] Though Inzlicht-Sprei communicated directly via email with Rubenstein to help effectuate this transfer, nothing in the email identified Rubenstein as the Trustee. (*See* Dkt. 120-45.)

[13] Though the VSA was executed by Berkshire, it had sourced the policy for Quantlife, who chose to use Wells Fargo as a securities intermediary. (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 141,

Fargo 56.1, Dkt. 119-2, ¶¶ 166–67.)  The Life Ownership Change Form was executed by Rubenstein and a representative of Wells Fargo on October 25, 2010.  (*Id.* ¶ 168.)  On November 2, 2010, Lincoln confirmed the change in ownership.  (*Id.* ¶ 169.)  There is no evidence that the Trust or Sara Sprei contested the change of ownership before 2016.  (*Id.* ¶ 183.)

### C. Further Sales, Death of Sara Sprei, and the Instant Litigation

The Policy underwent a series of title transfers until the Policy was sourced for LSH CO by CMG Life Services.  (*Id.* ¶¶ 186–89.)  LSH CO paid $9,196,153 for the Policy in January 2012.  (*See id.* ¶¶ 192–93.)  Following the sale of the Policy, CMG continued to monitor the Policy on LSH CO's behalf.  (*Id.* ¶ 195.)  As part of this monitoring, CMG sent a letter to Sara Sprei at her New York address on January 23, 2012 stating that LSH CO had purchased the Policy, noting that her health and medical information would be processed for the purpose of managing the Policy, and identifying Rubenstein as the current Trustee.  (*Id.* ¶ 197.)  CMG also asked Mills, the escrow agent from the 2010 sale, to try to contact Sara Sprei to determine whether she was still alive.  (*Id.* ¶ 200.)  Mills attempted to contact Sara Sprei at least twice, including sending a letter via certified mail to Sara Sprei's New York address on October 26, 2012.  (*Id.* ¶ 201.)  There is no evidence that Sara Sprei or Inzlicht-Sprei ever responded to any of these outreach attempts.[14]  (*Id.* ¶¶ 199,

---

185; Deposition of Wells Fargo Representative ("Wells Fargo Dep."), Dkt. 120-4, at 14:7–10.)  By acting as the securities intermediary, it is easier for a beneficial owner, like Quantlife, to continue selling the policy because Wells Fargo remains listed as the Policy owner and all that is required for the sale is an "Entitlement Order."  (Wells Fargo Dep., Dkt. 120-4, at 14:10–16:1.)  Accordingly, Wells Fargo has been listed as the Policy's owner and beneficiary since November 2, 2010 even as the beneficial owners have changed.  (Wells Fargo 56.1, Dkt. 119-2, ¶ 2.)

[14] Inzlicht-Sprei denies that he or Sara Sprei ever received these letters.  (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶¶ 196, 201.)  In support of his claim, he references his declaration where he implies that Sara Sprei never told him that she received these letters.  (Inzlicht-Sprei Dec., Dkt. 139-2, ¶¶ 19–21.)  However, because Sara Sprei's purported statements to her son are hearsay and thus inadmissible at trial, they are also not competent evidence on a motion for summary judgment.  *See Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 259 n.9 (E.D.N.Y. 2009) ("[H]earsay that would not be admissible at trial is likewise not competent evidence on a

202.) Finally, in 2015, Inzlicht-Sprei's medical office in New York, in response to a request by CMG, provided CMG with Sara Sprei's updated medical records. (*Id.* ¶ 205.)

Sara Sprei died on April 9, 2016. (*Id.* ¶ 211.) At this point, LSH CO paid a total of $5,059,506 in premiums. (*Id.* ¶ 209.) On August 3, 2016, Inzlicht-Sprei, as purported Trustee[15] of the Trust, submitted a claim to Lincoln for the Policy proceeds. (*Id.* ¶ 214.) He prepared the claim with the help of Herman Segal. (*Id.* ¶ 215.) On August 12, 2016, Lincoln sent a letter to Wells Fargo stating that Sara Sprei had died and confirmed that Wells Fargo was listed as the beneficiary of record for the Policy. (*Id.* ¶ 224.) In response, Wells Fargo also submitted a claim for the Policy proceeds on August 31, 2016. (*Id.* ¶ 225.) Unable to determine who the rightful owner of the Policy was, Lincoln initiated the instant interpleader action on September 16, 2016. (*See generally* Complaint, Dkt. 1.)

In the course of the instant litigation, Rubenstein, who was named as a defendant in this action in his role as Trustee, filed an Answer on behalf of the Trust that explicitly stated that the Trust "has not and does not assert any right, title, or interest to the proceeds of" the Policy. (Rubenstein Answer, Dkt. 64, at ECF[16] 5.) Before filing his answer, Rubenstein, through his

---

motion for summary judgment.") (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)), *aff'd*, 371 F. App'x 115 (2d Cir. 2010). Inzlicht-Sprei also states, though, that "[d]uring the entire time period involved with [the] Policy, it was [his] custom and practice to read all of [his] mother's mail. . . . [He] never saw this letter nor any of the other letters Wells Fargo relies on" (Inzlicht-Sprei Dec., Dkt. 139-2, ¶ 20)—evidence that can be considered on summary judgment. However, the Court finds that this self-serving assertion, unsupported by any other evidence, is insufficient to establish a material dispute of fact as to whether Inzlicht-Sprei was aware of the Policy's sale.

[15] Inzlicht-Sprei claims that no one had explained the mechanics of a Trust to him, so he believed that being the beneficiary was the same as being the Trustee. (Inzlicht-Sprei Dec., Dkt. 139-2, ¶ 17.)

[16] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

counsel, sent a draft of the Answer to Wells Fargo's counsel. (LSH CO 56.1 Statement ("LSH CO 56.1"), Dkt. 122-2, ¶ 121.) Wells Fargo's counsel stated that he was fine with Rubenstein's proposed Answer. (*Id.* ¶ 122.) At the same time, Wells Fargo, LSH CO, and Rubenstein, through their respective counsel, were engaged in settlement discussions. (*See id.* ¶ 125.) The Settlement Agreement provided that Wells Fargo would dismiss its breach of contract and indemnification claims against the Trust provided that Rubenstein, as Trustee, would execute a declaration[17] setting forth various factual matters related to the Policy and a filing by the Trust stating that it was not claiming any right, title, or interest in the Policy proceeds. (*Id.* ¶ 126; *see generally* Settlement Agreement, Dkt. 124-46.) The Settlement Agreement also included releases for Rubenstein, both individually and in his role as Trustee. (Settlement Agreement, Dkt. 124-46, at 4.) After months of negotiation, Rubenstein executed the Settlement Agreement on December 11, 2017. (LSH CO 56.1, Dkt. 122-2, ¶¶ 125, 133.) The same day, Rubenstein also filed an Answer in the instant action. (Rubenstein Answer, Dkt. 64 (dated December 11, 2017).) Rubenstein's executed Settlement Agreement included Rubenstein's declaration. (Rubenstein Dec., Dkt. 119-16, at 4; *see also* Dkt. 124-72 (transmitting the executed Settlement Agreement with executed Declaration via email on December 11, 2017).) Though Rubenstein was aware that Inzlicht-Sprei, as the Trust's beneficiary, was claiming that the sale of the Policy in 2010 was fraudulent, Rubenstein believed that he was fulfilling his fiduciary duties as Trustee by entering into the Settlement

---

[17] Wells Fargo had hoped to have the declaration to use in its mediation session with Inzlicht-Sprei, but Rubenstein did not execute it in time. (Dkt. 131, at ECF 20; *see also* Dkt. 134, at ECF 2 (asking, via email on December 4, 2017, when Wells Fargo can anticipate the executed Settlement Agreement and Declaration).) After that, it appears that Wells Fargo was planning on using the declaration for its anticipated motion for summary judgment. (Dkt. 133, at ECF 24 (noting that Rubenstein's attorney was not comfortable with a draft of the proposed declaration that stated it was being made in support of Wells Fargo's motion for summary judgment); *see also* Rubenstein Dec., Dkt. 119-16, at 1 (noting that Rubenstein was making the declaration "for all purposes allowed by law").)

Agreement.  (LSH CO 56.1, Dkt. 122-2, ¶¶ 134–35.)  On April 24, 2018, Rubenstein resigned as Trustee and appointed Inzlicht-Sprei as his successor.  (*Id.* ¶ 154.)

## II.    Procedural History

Lincoln initiated this interpleader action on September 16, 2016.  (Complaint, Dkt. 1.)  On December 21, 2016, it filed an amended interpleader complaint naming, as Defendants, Wells Fargo, Avi Rosenfeld as Trustee, Alan Rubenstein as Trustee, and Inzlicht-Sprei, individually, as Trustee/Beneficiary, and as executor of the Sara Sprei estate.  (Dkt. 16.)  It deposited the Policy proceeds with the Clerk of Court and was terminated as a party on May 5, 2017.  (Dkt. 43.)  Avi Rosenfeld was also terminated as a party on March 21, 2017 on the consent of all parties.  (*See* March 21, 2017 Docket Order.)

The remaining Defendants all filed answers to the amended interpleader complaint.  (*See* Wells Fargo Answer, Dkt. 27; Inzlicht-Sprei Answer, Dkt. 28; Wells Fargo Amended Answer, Dkt. 54; Rubenstein Answer, Dkt. 64.)  In Wells Fargo's Amended Answer, it asserted declaratory judgment claims that (1) it is entitled to the Policy's proceeds and (2) that no other party is entitled to the property because of unjust enrichment.  (Wells Fargo Amended Answer, Dk. 54, at 7–9.)  It also raised indemnification cross-claims against Inzlicht-Sprei, individually, as executor and beneficiary of the Sara Sprei estate, as well as against Rubenstein, who was the Trustee at the time (*id.* at 9–13), but it subsequently voluntarily dismissed those claims (*see* Wells Fargo Letter, Dkt. 59; Aug. 25, 2017 Docket Order; Notice of Voluntary Dismissal, Dkt. 67; Jan. 9, 2018 Docket Order).

On July 17, 2018, Inzlicht-Sprei was substituted as the Defendant Trustee replacing Alan Rubenstein, who resigned as Trustee on April 24, 2018.  (*See* July 17, 2017 Docket Order; *see also* LSH CO 56.1, Dkt. 122-2, ¶ 154.)  Before he resigned, Rubenstein filed an Answer on behalf of

Trust disclaiming any rights in the Policy Proceeds.[18]  (*See* Rubenstein Answer, Dkt. 64, at 5.) When Inzlicht-Sprei was substituted in as Defendant Trustee, he filed a new Answer on behalf of the Trust claiming it was entitled to the proceeds.  (*See* Trust Answer, Dkt. 94.)  LSH CO's motion to intervene was granted on September 13, 2018 (Sept. 13, 2018 Minute Order) and it raised two cross-claims against Inzlicht-Sprei in his role as Trustee: (1) breach of contract, and (2) indemnification (LSH CO Cross-Claims, Dkt. 102).  In response, Inzlicht-Sprei raised a cross-claim against LSH CO for "inducing/aiding and abetting a breach of fiduciary duty" arguing, *inter alia*, that LSH CO had induced Rubenstein into filing an Answer in this case, on behalf of the Trust, disclaiming any right in the Policy proceeds.  (Inzlicht-Sprei Answer and Cross-Claims, Dkt. 103.)

After discovery, Wells Fargo, LSH CO, and Inzlicht-Sprei all requested, and were granted permission to file dispositive motions addressing their various claims.  (Dkts. 108–110; Feb. 20, 2019 Docket Order.)  Specifically, Wells Fargo seeks summary judgment on its declaratory judgment claim, seeking a declaration that Wells Fargo is entitled to the interpleader property. (*See generally* Dkt. 119.)  LSH CO moves for judgment on the pleadings, or in the alternative, summary judgment on Inzlicht-Sprei's cross-claim for aiding and abetting.  (*See generally* Dkt. 122.)  Inzlicht-Sprei is seeking summary judgment for a declaration that the Trust is entitled to the interpleader property and dismissing LSH CO's cross-claim against him.  (*See generally* Dkt. 123.) The parties' respective motions were fully briefed on June 24, 2019.  (*See* Dkts. 119–144.)  The Court held oral argument on the parties' motions on March 10, 2020.  (*See* Mar. 10, 2020 Minute Entry.)

---

[18] As discussed *supra*, Rubenstein filed this Answer as part of his Settlement Agreement with Wells Fargo and LSH CO.

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks and citation omitted) (alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks and citation omitted). The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is

under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

## DISCUSSION

### I.    Entitlement to the Policy Proceeds

Wells Fargo and Inzlicht-Sprei both move for summary judgment, each arguing that they are entitled to the Policy proceeds. Inzlicht-Sprei argues that valid title to the Policy did not pass from the Trust to Wells Fargo because the VSA and related documents contained forged and unauthorized signatures. In response, Wells Fargo argues that Inzlicht-Sprei cannot prove that the signatures were forged or unauthorized, and that, in the alternative, equitable principles prevent Inzlicht-Sprei, on behalf of the Trust, from receiving the Policy proceeds.

### A.    The 2010 Sale of the Policy Was Valid

Wells Fargo argues that the VSA, which memorialized the sale of the Policy from the Trust to Berkshire, demonstrates that valid title passed from the Trust. (Wells Fargo Brief, Dkt. 119-1, at 13–15.) The Court agrees.

The VSA was signed on October 4, 2010 by Alan Rubenstein. (The VSA, Dkt. 120-11, at 23–24.) His signature was notarized. (*Id.*)[19] By October 2010, Alan Rubenstein, pursuant to a

---

[19] Sara Sprei's signature also appears on the VSA and is dated October 8, 2010, four days after Rubenstein's signature and one day after Berkshire's signature. (The VSA, Dkt. 120-11, at

Trustee Resignation effective August 18, 2010, was the new Trustee and, per the Trust Agreement, had "full and complete discretion" to sell the Policy. (Trustee Resignation, Dkt. 120-81; Trust Agreement, Dkt. 120-75, at 10.) He sold the Policy because he believed that it was in the Trust's best interest to receive some benefit from the Policy, rather than to let it remit entirely to H.M. Ruby. (*See* Rubenstein Dep., Dkt. 120-7, at 190:17–23.) In recognition of the valid sale, Lincoln changed the Policy's owner and beneficiary to Wells Fargo in early November. (Wells Fargo 56.1, Dkt. 119-2, ¶ 169.) Inzlicht-Sprei's arguments to the contrary are unavailing.

1. Forged Signatures

Inzlicht-Sprei first argues that valid title to the Policy did not pass because his, his mother's, and even the notary public's signatures on the VSA and other related documents were fake. (Inzlicht-Sprei Brief ("Inzlicht-Sprei Br."), Dkt. 123-1, at 12–14.) "Under New York law, a certificate of acknowledgment by a notary public gives rise to a presumption of due execution that can be rebutted only upon 'a showing of clear and convincing evidence to the contrary.'" *First Indem. of Am. Ins. Co. v. Shinas*, No. 03-CV-6634 (KMW) (KNF), 2009 WL 3154282, at *6 (S.D.N.Y. Sept. 30, 2009) (quoting *Spilky v. Bernard H. La Lone Jr., P.C.*, 641 N.Y.S.2d 916, 918 (N.Y. App. Div. 1996)); *see also Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc.*, No. 01-CV-4788 (RJH) (HBP), 2006 WL 587483, at *18 (S.D.N.Y. Mar. 8, 2006) ("As to presumptions, the Evidence Rules specifically provide that a presumption respecting a fact that is an element of a claim or defense to which state law applies is to be determined in accordance with state law.") (quoting 9 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2408 at 556

23–25.) Although Inzlicht-Sprei asserts that Sprei's signature on the VSA was forged, her signature was likely superfluous because, as discussed *infra*, Rubenstein, as Trustee for the Trust, which owned the Policy, had full discretion and authority to sell it. And, as also discussed *infra*, Inzlicht-Sprei cannot demonstrate that Sprei's signature was a forgery.

(2d ed. 1995)). "To rebut this presumption, a plaintiff must present evidence that is not 'of a doubtful character, such as the unsupported testimony of interested witnesses, nor upon a bare preponderance of evidence, but only on proof so clear and convincing as to amount to a moral certainty.'" *Orix Fin. Servs. v. Phipps*, No. 91-CV-2523 (RPP), 2009 WL 30263, at *4 (S.D.N.Y. Jan. 6, 2009) (quoting *Lum v. Antonelli*, 476 N.Y.S.2d 921, 923 (N.Y. App. Div. 1984)). Inzlicht-Sprei asserts that both Sara Sprei's signature on the VSA, as well as other supplemental documents, and the notary's signature notarizing those documents are fake. (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶¶ 14–18.) He also asserts that his signature on various documents related to the sale are fake as well, which is why he was purportedly unaware of the sale. (*Id.* ¶¶ 15, 18.)

First, Inzlicht-Sprei's mere assertion that both his and his mother's signatures are fake is insufficient to rebut the presumption. *First Indem. of Am. Ins. Co.*, 2009 WL 3154282, at *6 ("The mere 'unsupported testimony of an interested witness' that he or she did not sign the document is insufficient to rebut the presumption that a notarized signature is authentic.") (quoting *Demblewski v. Demblewski*, 701 N.Y.S.2d 567, 568 (N.Y. App. Div. 1999)). The only other evidence Inzlicht-Sprei offers in support of his argument is the testimony of the notary public, Nachum Salzman. (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶ 16.) At deposition, Salzman stated that the signature on the VSA endorsing his notary stamp "does not look like" his signature. (Salzman Dep., Dkt. 129-9, at 12:22–15:12; *see also id.* at 16:18–18:3 (testifying that his signature also does not appear on the "Beneficiary's Consent to Transfer of Policy, Waiver of Interest, and Release of Claims" form).)[20] This evidence from the notary fails to adequately support Inzlicht-Sprei's claim of forgery. In addition to the two documents Salzman asserts do not contain his signature (*see* The VSA, Dkt.

---

[20] Salzman, who worked at Signature Capital, also testified that he kept his notary stamp in his unlocked office and that he did not know if Herman Segal had access to it. (Salzman Dep., Dkt. 126-8, at 30:18–25; *id.*, Dkt. 124-5, at 48:18–25.)

120-11, at 23–24; Beneficiary Consent Form, Dkt. 120-12), Salzman notarized several additional documents executed in connection with the sale of the Policy during this period (Viatical Settlement Application, Dkt. 120-19; *see also* Dkts. 120-20, 120-22, 120-23).  There is no evidence suggesting that these signatures are not his.  Furthermore, at deposition, Salzman testified that he could not remember any single document he had notarized.  (Salzman Dep., Dkt. 126-8, at 57:3–9.)  Though Salzman's testimony that the notary signature on the VSA and Beneficiary Consent Form are not his is concerning, it is not enough to rebut the strong presumption of authenticity afforded to notarized signatures.  *See Phipps*, 2009 WL 30263, at *5–6 ("[The notary's] averment that it was her usual practice not to witness the execution of documents by the signee prior to notarization raises doubts as to the authenticity of the signature on the [document], but standing alone this averment is insufficient to rebut the strong presumption of authenticity of a notarized signature.").  Inzlicht-Sprei offers no other testimony or evidence, such as expert handwriting analysis, to support his assertion that the signatures are fake.  *Cf. Thunder Ridge Energy*, 2006 WL 587483, at *17, 20 (finding defendants established material questions of fact as to whether the presumption was rebutted by providing an affidavit from a handwriting expert that opined that the signatures of defendants did not match the signatures on the documents at issue); *Lombardo v. United Techs. Corp.*, No. 95-CV-2353 (WWE), 1997 WL 289669, at *2 (D. Conn. May 7, 1997) ("[W]hile a notary public's certificate of acknowledgement, regular on its face, carries a strong presumption of validity, in light of [the defendant's] affidavit [that the signature was forged] and the expert's opinion that this is not her signature, the issue of the authenticity of plaintiff's signature is in dispute.") (internal citation omitted); *Orix Credit Alliance, Inc. v. Khoury***,** No. 94-CV-2083 (HB), 1995 WL 2133, at *1 (S.D.N.Y. Jan. 3, 1995) (finding the presumption sufficiently rebutted when defendant offered proof that he was abroad at the time he allegedly signed the

document).  The Court finds that Inzlicht-Sprei has therefore failed to rebut the presumption of authenticity afforded to his and his mother's notarized signatures.  *See Phipps*, 2009 WL 30263, at *5–6 (finding that the presumption of authenticity was not rebutted when the evidence submitted by defendant was her "own denial that she was the signee," the existence of signatures on other documents, admittedly signed by defendant, appeared on their face to be the same, and testimony from the notary public that "she did not always follow the correct procedures when notarizing documents").[21]

## 2.    Trustee's Unauthorized Signature

Inzlicht-Sprei's second argument as to why the 2010 sale of the Policy was invalid is similarly ineffective.  He argues that even though Rubenstein signed the Trustee Resignation, clearly stating that his appointment as Trustee was effective August 18, 2010, Rubenstein's appointment did not take effect until sometime in October, after Rubenstein signed the VSA documents on October 4, 2010.  (Inzlicht-Sprei Br., Dkt. 123-1, at 13.)  Inzlicht-Sprei bases this argument on the fact that Rosenfeld, who resigned as Trustee in the same document, did not sign it until September 5, 2010, and that Rubenstein "did not accept the appointment until sometime between September 5 and 17[—]meaning that his appointment was not effective until 30 days later in October[,]" *i.e.*, sometime between October 5 and 17, 2010, which was after Rubenstein's October 4, 2010 execution of the VSA.  (*Id.*; *see also id.* at 6 (arguing that the "only clear evidence of Mr. Rubenstein's acceptance of the appointment was a fax, showing a September 17, 2010 transmission, from Mr. Rubenstein to Lincoln notifying the insurance company of his

---

[21] At oral argument, Wells Fargo also argued that because Rubenstein had full discretion and authority, as Trustee, to enter into the VSA, Inzlicht-Sprei's and his mother's signatures were unnecessary and thus their authenticity irrelevant.  While this argument has merit, the Court need not resolve it, given Inzlicht-Sprei's inability to show that either signature was forged.

appointment"); Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 126(D).)  This argument is incorrect

for several reasons.

First, "under New Jersey law[,][22] parties may make a contract effective prior to the date of

its execution."  *Zirinsky v. Tomai*, No. 99-CV-1037 (NRB), 2001 WL 11073, at *4 (S.D.N.Y. Jan.

4, 2001) (citing *State Troopers Fraternal Assoc. of New Jersey, Inc. v. State*, 692 A.2d 519, 523–

24 (N.J. 1997)).  "In determining the date the parties intended a contract to be effective, if no

subjective intent is apparent or ascertainable, that intent must be based on the objective language

of the contract.'"  *Id.* (quoting *State Troopers Fraternal Assoc. of New Jersey, Inc.*, 692 A.2d at

523–24).  Here, the Trustee Resignation clearly states that both Rosenfeld's resignation and

Rubenstein's appointment were "effective as of August 18, 2010" (Trustee Resignation, Dkt. 120-

81), and Inzlicht-Sprei has offered no evidence to suggest that the Rosenfeld and Rubenstein had

subjectively intended a different effective date (*cf.* Rosenfeld Dep., Dkt. 120-6, at 110:11–22,

179:17–19 (Rosenfeld testifying that "[t]here was a resignation document that was signed.  That

resignation document is dated August 18th"); Rosenfeld Dec., Dkt. 120-88, ¶ 16; Rubenstein Dec.,

Dkt. 119-16, ¶ 2; Rubenstein Dep., Dkt. 129-7, at 39:9–25).  Thus, as per the Trustee Resignation,

at a minimum,[23] Rubenstein's appointment took effect on August 18, 2010, regardless of the fact

---

[22] The Trust Agreement's choice-of-law provision specifies New Jersey law.  (Trust Agreement, Dkt. 120-75, at 14.)  However, New York law is in accord.  *See Colello v. Colello*, 780 N.Y.S.2d 450, 453 (N.Y. App. Div. 2004) ("It is fundamental that where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly.") (collecting cases).

[23] While the specified effective date in the Trust Resignation also supports the conclusion that Rosenfeld's resignation was also effective on August 18, 2010, for the reasons discussed *infra*, the Court need not resolve that issue.

that he and/or Rosenfeld may have signed the agreement on a later date or that Rubenstein did not notify Lincoln of his appointment as Trustee until later.

Second, even assuming that Inzlicht-Sprei is correct that the thirty-day time period specified in the Trust Agreement governs when a new Trustee's appointment takes effect, Rubenstein's appointment would have been effective thirty days after August 18, 2010, or September 18, 2010, which, in turn, means that he was authorized to execute the sale of the Policy on behalf of the Trust on October 4, 2010 when he signed the VSA. Moreover, the plain language of the Trust Agreement does not support Inzlicht-Sprei's argument that the Trust Agreement governs the effective date of Rubenstein's appointment as Trustee. Paragraph 5(G) of the Trust Agreement simply states that "[a]ny Trustee may resign at any time by delivering or mailing a notice in writing of such resignation . . . to his designated successor[,] . . . and thirty days thereafter such resignation shall take effect." (Trust Agreement, Dkt. 120-75, at 6.) It does not impose any similar requirement on the effective date for the appointment of a trustee. (*Cf. id.* (noting that a resigning trustee may resign by delivering notice of his resignation to his successor, "if such designee has indicated his willingness to act"); *id.* at 5 (noting that if there is a trustee vacancy "then the last Trustee serving hereunder may appoint his or her Successor, or in default therefore, then a majority of the adult beneficiaries . . . shall fill such vacancy").) Indeed, the Trust Agreement clearly contemplates that the Trust could be governed by more than one Trustee at a time. (*Id.* at 6 (noting that a trustee can resign by delivering his resignation "to the others then acting"); *see also id.* at 7 ("All decisions regarding any trust shall be made by a majority of the Trustees not disqualified to act thereon.").) Accordingly, the plain language of the Trust Agreement indicates that Rubenstein's appointment as Trustee was effective August 18, 2010, which means that he was authorized to sell the Policy on behalf of the Trust on October 4, 2010.

Third, and relatedly, even accepting *arguendo* Inzlicht-Sprei's argument that Rosenfeld's resignation did not become effective until October 5, 2010, this fact would not have precluded execution of the Policy sale. Even if Rubenstein and Rosenfeld were co-Trustees at the time of the sale, the Trust Agreement provides that the actions of any one trustee is binding on all of the trustees. (See *id.* at 7 ("However, insofar as third persons dealing with the Trustees are concerned, instruments of any kind . . . need be executed by only one Trustee, and when so executed shall be fully binding as if executed by all of them.").) Therefore, the Policy sale would still have been valid even if Rubenstein was a co-Trustee at the time of the sale.

*    *    *

The Court finds that Inzlicht-Sprei's arguments that various signatures on the VSA and related sale documents are fake, that Rubenstein was not authorized to act on behalf of the Trust in selling the Policy, and the evidence he adduces in support of those arguments, are insufficient to raise a material dispute of fact as to the validity of the Policy sale, much less show, as a matter of law, that the sale was, in fact, invalid. Accordingly, the Court grants Wells Fargo's summary judgment motion and denies Inzlicht-Sprei's summary judgment motion as to who is entitled to the Policy proceeds.

### B. Wells Fargo's Equitable Defenses Entitle It to the Policy Proceeds

Wells Fargo argues that even assuming, *arguendo*, that valid title of the Policy did not pass to Wells Fargo in October 2010 because of the forged and/or unauthorized signatures, the Trust is still not entitled to the Policy proceeds. (*See* Wells Fargo Br, Dkt. 119-1, at 15–17.) "An action to set aside a contract for fraud is equitable and thus subject to equitable defenses." *John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Family Life Ins. Tr.* ("*Baum*"), 357 F. Supp. 3d 209, 217 (E.D.N.Y. 2018) (citing *Piedra v. Vanover*, 579 N.Y.S.2d 675, 677 (N.Y. App. Div. 1992)), *aff'd*, 783 F. App'x 89 (2d Cir. 2019). Specifically, Wells Fargo asserts four equitable

defenses: ratification, laches, equitable estoppel, and unclean hands. (Wells Fargo Br., Dkt. 119-1, at 15–21.)

Wells Fargo relies substantially on *Baum*, in which the Honorable Nina Gershon found, under strikingly similar factual circumstances, that Wells Fargo was entitled to a life insurance policy under the doctrines of ratification and laches. (*See id.* at 16–19 (discussing *Baum*).) In *Baum*, Signature Capital worked with the Baum family to procure a life insurance policy from the John Hancock Life Insurance Company of New York on the life of Solomon Baum. 357 F. Supp. 3d at 211–14. The policy application noted that a trust, with Baum's son listed as the beneficiary, would own the policy. *Id.* at 213. The policy premiums were funded through a financing agreement with H. M. Ruby. *Id.* at 214. In April 2010, when the policy was at risk of lapsing, Signature Capital sold the policy. *Id.* at 215. Though Herman Segal directed the trustee to sign and fax the sale documents, as well as supporting documents, to the buyer, it was undisputed that the trustee never signed the documents. *Id.* However, the trustee testified that he knew that the policy was "all done" at some point because he stopped receiving mail associated with the policy. *Id.* The trustee never took any steps to repudiate the sale. *Id.* Though the parties disputed whether the trust ever received $50,000 from the sale, the sale proceeds were also used to pay off the loan from H.M. Ruby. *Id.* at 216, 219. In 2015, the trust beneficiary learned about the sale of the policy, but waited a year, until after his father's death, to contest the sale of that policy based on allegations that the insured's signature on the sale documents was fake.[24] *Id.* at 216–17. The Court finds the reasoning in *Baum,* which was recently affirmed by Second Circuit, 783 F. App'x 89 (2d

---

[24] There was factual dispute as to whether the beneficiary had informed the policy's servicer about the fraud in 2015, but the Court found that dispute to be immaterial because even if the beneficiary had initially raised this issue, he "took no steps to determine who owned the Policy and did not otherwise contact either [the trustee] or [the policy owner] as to the purported forgery." *Baum*, 357 F. Supp. 3d at 220.

Cir. 2019) (summary order), applicable to Wells Fargo's equitable claims of entitlement to the Policy proceeds in this action.

1.   Ratification

As noted in *Baum*, "[r]atification is a waiver of existing rights," 357 F. Supp. 3d at 218 (citing *In re Levy*, 893 N.Y.S.2d 142, 144 (N.Y. App. Div. 2010)), *i.e.*, "[r]atification is a party's affirmance of an *earlier* act that did not bind it at the time," *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 23 (2d Cir. 2017) (summary order) (emphasis in original); *see also HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'ns Corp.*, No. 07-CV-553 (RJA), 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009) ("The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers.").

> When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable.

*HSBC Bank USA, Nat'l Ass'n*, 2009 WL 385474, at *6 (quoting *Rothschild v. Title Guarantee & Tr. Co.*, 97 N.E. 879, 881 (N.Y. 1912)). "Under New York law, 'ratification requires full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" *Cammeby's Mgmt. Co., LLC*, 720 F. App'x at 22 (quoting *DiPizio Const. Co. v. Erie Canal Harbor Dev. Corp.*, 23 N.Y.S.3d 762, 764 (N.Y. App. Div. 2015)). "[R]atification may be implied when a party fails to repudiate, or retains the benefit of, an unauthorized transaction when he knows of the material

facts concerning the agreement." *Baum*, 357 F. Supp. 3d at 218 (citing *Hempstead Realty, LLC v. Sturrup*, 57 N.Y.S.3d 675 (Table), 2017 WL 2215747, *6 (N.Y. Sup. Ct. May 15, 2017)).[25]

In *Baum*, although the trustee did not sign the sale documents, Judge Gershon nonetheless found that he had ratified the sale based on the trustee's drivers license being included in the due diligence documentation sent to the policy purchaser, the trustee testifying that he "would have signed" the sale documents, and the trustee doing "nothing to repudiate the sale." *Id.* at 219. Here, the evidence of Rubenstein's intent to ratify the sale of the Policy is even stronger. First, it is undisputed that Rubenstein was aware of the sale given that he actually signed the sale documents. (*See* Rubenstein Dec., Dkt. 119-6, ¶ 6.) Second, once he was undisputedly Trustee in late October 2010 (*cf.* Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 137), Rubenstein not only failed to repudiate the sale, but thereafter affirmed it, on more than occasion, first by submitting documentation of the change in the Policy's ownership to Lincoln on October 25, 2010, and then by transmitting, via email, all of the relevant sale documents to Signature Capital on November 10, 2010. (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 168, 171.) Furthermore, as in *Baum*, the Trust accepted the benefits of the sale, including the $3,163,363 of the sale proceeds that were sent directly to H.M. Ruby in satisfaction of its premium financing loan to the Trust and the $1,200,000 that was deposited into the Trust's account. (*Id.* ¶¶ 166, 172.)

Inzlicht-Sprei argues that Rubenstein cannot ratify "his own wrongful transfer." (Inzlicht-Sprei Opposition Brief, Dkt. 139, at 8–11.) However, Inzlicht-Sprei offers only vague, irrelevant

---

[25] New Jersey law is in accord with New York law. *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 127 (2d Cir. 2010) ("Ratification requires intent to ratify plus full knowledge of all the material facts. Ratification may be express or implied, and intent may be inferred . . . from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act.") (quoting *Thermo Contracting Corp. v. Bank of N.J.*, 354 A.2d 291, 296 (N.J. 1976)).

allegations that Rubenstein is untrustworthy and acted "wrongfully" in selling the Policy. (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶ 79 (asserting that "Rubenstein has been accused of fraud and other wrongdoing in connection with life insurance trusts in multiple jurisdiction[s] in the United States") (collecting cases); *id.* ¶ 80 (asserting that in one lawsuit Rubenstein was found guilty of a conspiracy to commit fraud by a jury).) There is nothing to support Inzlicht-Sprei's assertion that Rubenstein acted inappropriately in deciding to sell the Policy. There is no evidence that Rubenstein somehow profited from the Policy's sale, beyond the few thousand dollars he was paid in trustee fees, or that he was aware of the Agreement between Inzlicht-Sprei and Signature Capital and sought to thwart or undermine it.[26] Rather, Rubenstein's undisputed testimony demonstrates that Rubenstein believed it was better for the Trust to receive some benefit from the sale of the Policy, that he understood the importance of the Sprei Family receiving their portion of the money from the sale, and that he knew that the remainder of the money would be distributed to the Segals and Spiegels as commissions. (Rubenstein Dep., Dkt. 120-7, at 190:17–23; *id.*, Dkt. 129-7, at 69:2–71:23.) Indeed, other undisputed evidence in the record supports Rubenstein's stated reason for selling the Policy, namely, that the Policy was on the verge of lapsing in August 2010, when Rubenstein became a Trustee (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 116, 123)—which would have resulted in the Trust getting nothing.[27]

---

[26] With respect to the purported oral agreement between Inzlicht-Sprei and Herman Segal, pursuant to which Inzlicht-Sprei would have had the first right to buy the Policy before any subsequent sale of it, there is no evidence, besides Inzlicht-Sprei's own statements, that such an agreement ever existed, and, more importantly, absolutely no evidence that Rubenstein was aware of any such agreement.

[27] The Court also notes that Inzlicht-Sprei provides no legal support for his argument that a trustee with unclean hands cannot ratify the sale, and the Court has found none. However, even assuming *arguendo* the correctness of this proposition and that there is genuine dispute of fact as to Rubenstein having unclean hands, Inzlicht-Sprei would still not be entitled to relief. As the trust's beneficiary, Inzlicht-Sprei could ratify the unauthorized acts of a trustee. *See In re Levy*, 893 N.Y.S.2d at 144 (citing Bogert's The Law of Trusts and Trustees § 942 ("After a breach of

Accordingly, even if the Policy's sale was invalid at the time of execution, Rubenstein ratified that sale, entitling Wells Fargo as the successor owner and beneficiary of the Policy to its proceeds.

2. Laches

The Court also finds, as in *Baum*, that Wells Fargo is entitled to the Policy proceeds based on the doctrine of laches. "Laches is defined as such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity." *Schulz v. State*, 615 N.E.2d 953, 957 (N.Y. 1993) (internal quotation marks and citation omitted). "The essential element of this equitable defense is delay prejudicial to the opposing party." *Baum*, 357 F. Supp. 3d at 220 (citing *Schulz*, 615 N.E.2d at 957).

In *Baum*, the court found that the one-year delay by the Trust's beneficiary in challenging the sale of the life insurance policy was sufficient to find laches, because the beneficiary failed to explain why he did not act on his rights earlier,[28] and Wells Fargo had incurred substantial prejudice during that delay by paying thousands of dollars in premiums and administrative costs

---

trust has occurred, a beneficiary may expressly or impliedly express satisfaction with the trustee's action and thereby prevent himself from claiming thereafter that it was illegal.")). Though Inzlicht-Sprei argues that he could not have ratified the sale or Rubenstein's actions because he was unaware of these acts, Inzlicht-Sprei's inability to prove his lack of awareness, as discussed *infra*, means that he cannot counter the argument that he ratified Rubenstein's acts through his silence and inaction regarding the sale. *See Cammeby's Mgmt. Co., LLC*, 720 F. App'x at 22 ("Acquiescence or silence, however, can indeed give rise to an inference of ratification.") (citing *Suncoast Capital Corp. v. Glob. Intellicom, Inc.*, 719 N.Y.S.2d 652, 653 (N.Y. App. Div. 2001)).

[28] As noted *infra*, in *Baum*, there was a factual dispute as to whether the beneficiary had informed the policy's servicer about the fraud earlier, but the Court found that dispute to be immaterial. *Baum*, 357 F. Supp. 3d at 220. Here, there is no dispute that neither Inzlicht-Sprei nor Sara Sprei never contested the sale to anybody before 2016. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 213.)

to maintain the Policy. *Id.* The Court also noted that the insured's death, which had occurred before the beneficiary began contesting the policy's sale, "resulted in a loss of substantial evidence that could have been crucial to Wells Fargo in defending its ownership of the [p]olicy." *Id.* at 220–21.

The same is true here. It is undisputed that in the six years between the sale of the Policy and Sara Sprei's death, neither Inzlicht-Sprei nor Sara Sprei ever contested the sale. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 213.) Inzlicht-Sprei argues that he was not aware of the sale,[29] and therefore did not know to contest it, because his signature on the sale documents were forged. However, for the reasons discussed *supra* at Part I.A.1, the Court finds that Inzlicht-Sprei cannot demonstrate forgery of any signatures on the sale documents. Likewise, Inzlicht-Sprei argues that he was not made aware of the sale after the fact because neither he nor his mother received the various communications from Lincoln and CMG seeking to verify Sara Sprei's information. (Inzlicht-Sprei Dec., Dkt. 139-2, ¶¶ 19–21.) However, as the Court has already noted, *see supra* at n.14, Inzlicht-Sprei provides no competent evidence to support that self-serving assertion. Furthermore, Inzlicht-Sprei also does not dispute that his medical office sent Sara Sprei's updated medical records to CMG in 2015. (Inzlicht-Sprei 56.1 Response, Dkt. 139-1, ¶ 205.) Therefore, there is no competent evidence to support Inzlicht-Sprei's argument that he could not have

---

[29] The Court notes in this context that, as argued by Wells Fargo, Inzlicht-Sprei certainly had notice that something had happened with the Policy as of November 23, 2010, when he received a $50,000 "good will" payment from Rubenstein, which was made at Steven Spiegel's direction following a conversation in which Spiegel told Inzlicht-Sprei that the Policy could not be salvaged. (*See* Wells Fargo 56.1, Dkt. 119-2, ¶¶ 175–77.) Based on this conversation, as well as the terms of the Agreement, Inzlicht-Sprei, at a minimum, had reason to believe that the Policy had lapsed; yet, Inzlicht-Sprei did nothing to follow up with the Trustee, Segal, or Spiegel to inquire about the status of the Policy after receiving the $50,000 payment.

contested the Policy's sale before 2016 because he was unaware of it.[30]  Moreover, as in *Baum*, Wells Fargo, in its role as securities intermediary for LSH CO, has incurred significant prejudice as a result of Inzlicht-Sprei's failure to assert his rights given that significant amounts—*i.e.*, $5,059,506—have been paid to maintain the Policy while Wells Fargo was listed as the Policy's owner.  (*See* Wells Fargo 56.1, Dkt. 119-2, ¶¶ 209–10.)  Indeed, in *Baum*, the trust beneficiary took action after a year, and not almost six years later as here, to contest the sale of the life insurance policy.  Finally, Sara Sprei's death in 2016 has likewise deprived Wells Fargo of significant evidence, such as her testimony as to whether she signed the sale documents or was made aware of the sale due to Lincoln's 2010 and CMG's 2012 letters.

Accordingly, the Court finds that laches bars Inzlicht-Sprei from claiming the Policy's proceeds.

### C.    Inzlicht-Sprei Is Not Entitled to the Policy on the Basis that it is a STOLI Policy

Finally, Inzlicht-Sprei argues that he, as executor of Sara Sprei's estate, is entitled to the Policy's proceeds because the Policy is a stranger-originated life insurance ("STOLI") policy and therefore void *ab initio* under New Jersey law.  (Inzlicht-Sprei Br., Dkt. 123-1, at 19–20); *see also Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839, 841 (N.J. 2019) ("[W]e find that STOLI policies are against public policy and are void *ab initio*, that is, from the beginning.").  The Court disagrees.

---

[30] Likewise, assuming *arguendo* that Inzlicht-Sprei, as the Trust's beneficiary, would have needed to ratify Rubenstein's actions in selling the Policy, this lack of evidence would also mean that Inzlicht-Sprei cannot counter the argument that he, in fact, did ratify Rubenstein's acts through silence, as discussed *supra*.  *See Cammeby's Mgmt. Co., LLC*, 720 F. App'x at 22 ("Acquiescence or silence, however, can indeed give rise to an inference of ratification.") (citing *Suncoast Capital Corp. v. Glob. Intellicom, Inc.*, 719 N.Y.S.2d 652, 653 (N.Y. App. Div. 2001)).

1.     Choice of Law

First, Inzlicht-Sprei's argument relies on the application of New Jersey law.  (*See* Inzlicht-Sprei Br., Dkt. 123-1, at 18.)  "[A] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state."  *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018).  "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved."  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993)).  Here, there is such a conflict.  While STOLI policies are void *ab initio* in New Jersey, they are merely voidable in New York.  *Compare Sun Life Assurance Co. of Canada*, 208 A.3d at 841 (noting that STOLI policies are against New Jersey public policy and therefore void *ab initio*), *with AEI Life LLC*, 892 F.3d at 137–38 (holding that "under New York law, wagering insurance contracts entered for the benefit of parties that lack an insurable interest [*i.e.*, STOLI policies] are simply voidable, not void *ab initio*").  "New York law looks to the 'center of gravity' of a contract to determine choice of law."  *Forest Park Pictures*, 683 F.3d at 433 (quoting *Stolarz*, 613 N.E.2d at 939).  "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties."  *AEI Life LLC*, 892 F.3d at 135 (internal quotation marks and citation omitted).

"The two most important factors under New York law are the place of contracting and the place of performance."  *Id.*  The place of contracting is where "the policy was negotiated, contracted, and signed."  *Id.*  Here, the place of contracting was New York.  Though the Policy application states it was signed in New Jersey (The Application, Dkt. 120-69, at 8), none of the signatories remember signing the Policy in New Jersey (Wells Fargo 56.1, Dkt. 119-2, ¶¶ 69–70,

77, 81–82; *see also* Rosenfeld Dep., Dkt. 120-6, at 127:9–11; William Segal Dep., Dkt. 120-10, at 54:13–19). All of the signatories live and work in New York. (*See* Wells Fargo 56.1, Dkt. 119-2, ¶¶ 9, 13, 15, 43, 45–46.) Though the Trust, listed as the Policy's owner and beneficiary on the Application (*see* The Application, Dkt. 120-69, at 3), had a New Jersey address, Rosenfeld could neither recall anything about that address, nor identify whether Signature Capital or Inzlicht-Sprei had a connection to that address. (Rosenfeld Dep., Dkt. 120-6, at 116:14–117:10; *see also* Draft Trust Agreement, Dkt. 120-89, at ECF 9 (noting, in an earlier draft of the Trust Agreement, that the Trust would be governed by the laws of New York).) Sara Sprei also underwent a medical examination for the Policy application in New York. (Inzlicht-Sprei Dep., Dkt. 120-8, at 101:3–24.)

Likewise, the place of performance—"that is, [where] the premiums were billed and a claim on the policy was made," *Fed. Ins. Co. v. Keybank Nat. Ass'n*, 340 F. App'x 5, 8 (2d Cir. 2009) (summary order)—is also New York. Though the premiums were presumably billed to the Trust, which had a New Jersey address, Rosenfeld received all of the mail for the Trust at a New York address. (Wells Fargo 56.1 Statement, Dkt. 119-2, ¶¶ 116–17, 123, 133–34.) The premiums were paid from the Trust's New York bank account. (*Id.* ¶ 92.) The premium financing agreement with H.M. Ruby was executed in New York. (*Id.* ¶ 100.) Finally, though the claim on the Policy, had it not been sold in 2010, would have presumably been paid to the Trust, which, although nominally located in New Jersey, had its bank account in New York. (*Id.* ¶ 92.) Furthermore, pursuant to the Agreement, any proceeds from the Policy, if it was still owned by the Trust, would have been divided between Inzlicht-Sprei and Signature Capital, both of which are located in New York. (*See* The Agreement, Dkt. 120-33; Wells Fargo 56.1, Dkt. 119-2, ¶¶ 10, 15.)

Inzlicht-Sprei counters that New Jersey law should apply for the following reasons: (1) the Policy Application states it was signed in New Jersey; (2) William Segal, the insurance agent for the sale, was licensed in New Jersey; (3) the Trust had a New Jersey address; and (4) Berkshire, the buyer of the Policy, was licensed to buy life insurance policies in New Jersey and had requested various documents during the sale process that were required by New Jersey law.[31]  (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶¶ 155–84.)  However, these contacts to New Jersey pale in comparison to the New York contacts described *supra.*  "The principal contact with New Jersey was the purported place of signing, but even if [the Court] assumed this fictional place of signing were real for the choice-of-law analysis, that one contact would not outweigh the significance of New York's various relationships with the policy."  *AEI Life LLC*, 892 F.3d at 136 (footnote omitted).  Likewise, though William Segal had a New Jersey insurance license, he worked for a New York company, did not work out of a New Jersey office, and did not remember any of the meetings regarding the Policy occurring in New Jersey.  (William Segal Dep., Dkt. 120-10, at 19:2–7, 55:22–56:2.)  Also, as noted above, though the Trust had a New Jersey address, the Trust Agreement was executed in New York and all correspondence and payments between Lincoln and the Trust occurred in New York.  Finally, Berkshire's contacts with New Jersey while purchasing the policy do not alter or outweigh the New York contacts relating to the Policy's actual contracting and performance.

---

[31] Inzlicht-Sprei also asserts that Lincoln was not authorized to issue life insurance policies in New York.  In support of that contention, he provides an unidentified and undated page that states "[t]he Lincoln National Life Insurance Company . . . does not solicit business in New York, nor is it licensed to do so."  (Dkt. 137-1.)  However, Lincoln's 30(b)(6) representative testified at deposition that it was licensed to sell life insurance policies in New York in 2008.  (Deposition of Lincoln's Representative, Dkt. 126-5, at 108:13–17.)  Thus, the Court gives no weight to the one-page unauthenticated document proffered by Inzlicht-Sprei as evidence on this issue.

Accordingly, the Court finds that, considering the totality of the contacts, the Policy's "center of gravity" is New York, and that New York law therefore applies.

### 2. STOLI Policies are Voidable Under New York Law

As an initial matter, it does not appear that the Policy is a STOLI policy under New York law. "New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose." *Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535, 536–37 (N.Y. 2010) (deciding, on a request for certified question from the Second Circuit, that such policies are not STOLI policies under New York law).

However, even assuming that the Policy is a STOLI policy, under New York law, it is merely voidable, and not void *ab initio*. *AEI Life LLC*, 892 F.3d at 137–38 (holding that "under New York law, wagering insurance contracts entered for the benefit of parties that lack an insurable interest [*i.e.*, STOLI policies] are simply voidable, not void *ab initio*"). A voidable policy can be ratified. *See Rivera v. Sovereign Bank*, 976 F. Supp. 2d 270, 289 (E.D.N.Y. 2013) ("Ratification is an act by which an otherwise voidable agreement is made valid."). The Court has already determined that Wells Fargo would be entitled to the Policy's proceeds based on the equitable defense of ratification. *See supra* at Part I.B.1. Accordingly, Inzlicht-Sprei's assertion that he is entitled to the proceeds because the Policy is a STOLI policy fails.[32]

---

[32] Moreover, the Court is troubled by Inzlicht-Sprei's assertion that he, as the executor of Sara Sprei's estate, would be entitled to the Policy proceeds under New Jersey law. Though Inzlicht-Sprei correctly notes that

> [i]f the beneficiary, assignee, or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement, or injury of the individual insured, the individual insured, or his executor or administrator, as the case may be, may maintain an action to recover those benefits from the person so receiving them,

*   *   *

Accordingly, having found that Wells Fargo is entitled to the Policy proceeds because the sale of the Policy was valid and based on equitable defenses, the Court grants Wells Fargo's summary judgment motion and denies Inzlicht-Sprei's summary judgment motion as to the Policy proceeds. Given that Wells Fargo is entitled to the Policy's proceeds, the Court finds that LSH CO's breach of contract and indemnification claims against Inzlicht-Sprei, as well as Inzlicht-Sprei's motion for summary judgment on that claim, are moot.

## II. Aiding and Abetting Breach of Fiduciary Duty Claim

LSH CO seeks summary judgment[33] on Inzlicht-Sprei's claim that it aided and abetted a breach of fiduciary trust. (LSH CO Brief, Dkt. 122-1, at 21–25.) To state a claim for aiding and

---

N.J. Stat. Ann. § 17B:24-1.1(c), the New Jersey Supreme Court in *Sun Life* noted that "it was difficult to make bright-line rules" about STOLI policies and that "courts should develop a record and balance the relevant equitable factors" when determining where the proceeds of a STOLI policy should go, 208 A.3d at 852, 859. In *Sun Life*, it was the insurer, Sun Life, that sought to void the policy as a STOLI policy and to be excused from paying the proceeds on the policy after the insured's death; the focus of the decision was on whether Wells Fargo, who had bought the policy on the secondary market and paid premiums to keep the policy current, was entitled to reimbursement for its premium payments out of the policy proceeds. *Id.* at 842, 857–59. Here, Lincoln has already disbursed the Policy proceeds. Therefore, the only considerations are how the proceeds, based on equitable principles, should be distributed between Inzlicht-Sprei and Wells Fargo. Given that it was Inzlicht-Sprei's Agreement with Herman Segal that turned the Policy into a STOLI policy in the first place, *cf. id.* at 850, the Court finds it hard to believe that New Jersey public policy would countenance Inzlicht-Sprei, who has not paid a single cent towards the Policy, being the beneficiary of New Jersey's prohibition on STOLI policies.

[33] LSH CO filed a motion for judgment on the pleadings, or, in the alternative, a motion for summary judgment. (*See generally* Dkt. 122.) The Court finds that the parties had an adequate opportunity to respond to LSH CO's potential summary judgment motion and therefore converts LSH CO's motion for judgment on the pleadings into one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

36

abetting a breach of fiduciary duty, Inzlicht-Sprei must show: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *In re Agape Litig.*, 773 F. Supp. 2d 298, 325 (E.D.N.Y. 2011) (internal quotation marks and citation omitted); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 49–50 (2d Cir. 2005) (same) (citing *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003)).[34]

Although Inzlicht-Sprei initially asserted in his cross-claim against LSH CO and in his summary judgment motion as to that claim that LSH CO aided and abetted Rubenstein's alleged breach of fiduciary duty in several ways (*see* Inzlicht-Sprei Answer and Cross-Claims, Dkt. 103, ¶ 97), Inzlicht-Sprei's counsel conceded at the March 10, 2020 oral argument that LSH CO could only have been involved in a breach of fiduciary duty after the initiation of the instant litigation, as there is no evidence that LSH CO and Rubenstein had any interaction prior to September 2016, when this litigation began. Therefore, of the various breaches of fiduciary duty that Inzlicht-Sprei alleges, the Court will focus on those that allegedly occurred during the course of this litigation, *i.e.*, the allegations that Rubenstein breached his fiduciary duty by entering into a Settlement Agreement with LSH CO and Wells Fargo, by filing an Answer and executing a declaration on behalf of the Trust that disavowed any interest in the Policy proceeds, and by making statements at his deposition that were manufactured by Wells Fargo and/or LSH CO. (*Cf. id.*) The Court finds that, even assuming *arguendo* that Rubenstein breached his fiduciary duty in one or more of

---

[34] The Court applies New York law to this claim because "[u]nder New York choice of law rules, tort claims are outside the scope of contractual choice of law provisions," *Burns v. Del. Charter Guar. & Tr. Co.*, 805 F. Supp. 2d 12, 22 (S.D.N.Y. 2011) (citation omitted), and "[b]oth parties predominantly rely upon New York law in their analyses of this claim, indicating their consent to such application," *Obeid v. La Mack*, No. 14-CV-6498 (LTS) (HBP), 2019 WL 1227789, at *4 (S.D.N.Y. Mar. 15, 2019), *reconsideration denied sub nom. Obeid ex rel. Gemini Real Estate Advisors LLC v. La Mack*, 2019 WL 2209160 (S.D.N.Y. May 22, 2019).

these ways during the course of this lawsuit, Inzlicht-Sprei has failed to show there is a material dispute of fact as to whether LSH CO knowingly induced or participated in any such breach.

"[A] person knowingly participates in a breach of fiduciary duty only when he or she provides substantial assistance to the primary violator." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (internal quotation marks and citation omitted). This knowing participation "requires more than a defendant's knowledge of the primary violation." *In re Sharp Int'l Corp.*, 302 B.R. 760, 774 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005). Furthermore, "even without directly assisting in the commission of the underlying wrong, a defendant may still be liable as an aider and abettor for 'inducing' or 'encouraging' a fiduciary to breach his duties to another." *Id.* at 774–75 (citing *Kaufman*, 760 N.Y.S.2d at 169).

Here, there is no evidence that LSH CO assisted, induced, or encouraged any of Rubenstein's purported breaches. For example, LSH CO's role in then-Defendant Rubenstein's filing of his December 11, 2017 Answer was minimal. It was Rubenstein's counsel that reached out to Wells Fargo's counsel[35] in October 2017, expressing his belief that Rubenstein needed to file an Answer "given Inzlicht-Sprei's refusal to let Rubenstein out of the case" and providing a draft for Wells Fargo's counsel to review. (Inzlicht-Sprei 56.1, Dkt. 123-2, ¶ 94; Inzlicht-Sprei's 56.1 Response, Dkt. 140-1, ¶ 121.) Wells Fargo's counsel responded that it was "fine with the itemized responses [by Rubenstein]." (LSH CO 56.1, Dkt. 122-2, ¶ 122.) Though LSH CO,

---

[35] LSH CO and Wells Fargo, whose interests were aligned, were represented by the same counsel. (*See* Dkts. 49–51, 98–100.) The Court therefore attributes the actions of Wells Fargo's counsel to LSH CO as well and refers primarily to their joint counsel as Wells Fargo's counsel in this section.

through its counsel, played a much more proactive role in Rubenstein's declaration[36] by providing an initial draft for Rubenstein's counsel to review and revise (*see generally* Dkts. 131–33), nothing in the attorneys' exchange of the draft suggests that LSH CO was assisting, inducing, or encouraging Rubenstein to breach his fiduciary duty or make any false claim or statement. (*See, e.g.*, Dkt. 131, at ECF 4 (stating that "we [counsel for Wells Fargo] are hopeful that we can work toward a resolution without Rubenstein filing an answer"); *id.* at ECF 21 (stating that "[w]e [counsel for Wells Fargo] have incorporated your suggested revisions to the draft declaration").) In fact, the first of the emails between the attorneys for Wells Fargo and Rubenstein suggest that Wells Fargo was merely responding to Rubenstein's desire to be dismissed from the action. (*See* Dkt. 131, at ECF 1 (noting that "[a]fter the Salzman deposition, we [*i.e.*, the attorneys for Wells Fargo and Rubenstein] briefly discussed Mr. Rubenstein's role in this litigation and *his desire* to seek dismissal from the action") (emphasis added).) Additionally, though Inzlicht-Sprei notes that Rubenstein had already executed his declaration stating that the Trust was not entitled to the Policy proceeds by the time he entered into the Settlement Agreement with Wells Fargo/LSH CO (Inzlicht-Sprei 56.1 Response, Dkt. 140-1, ¶ 133), Inzlicht-Sprei does not provide any facts suggesting that Rubenstein's preemptive execution of this declaration was evidence that LSH CO had assisted, induced, or encouraged Rubenstein to breach his fiduciary duty by executing it in the first place. In fact, counsel for Wells Fargo was hoping to have the declaration by July 2017, in time for their mediation with Inzlicht-Sprei (*see* Dkt. 131, at ECF 30 (noting, on July 12, 2017, that "[w]e [counsel for Wells Fargo] are mediating the Sprei matter tomorrow, and would love to,

---

[36] As noted *supra* n.17, it appears that Wells Fargo and LSH CO were hoping to use the declaration in a mediation with Inzlicht-Sprei as well as to later support their anticipated summary judgment motion.

if possible, have the executed declaration")), yet Rubenstein did not execute the declaration until November.

Inzlicht-Sprei does not dispute that LSH CO, Wells Fargo, and Rubenstein entered into the Settlement Agreement after months of negotiations between the parties' counsel (Inzlicht-Sprei 56.1 Response, Dkt. 140-1, ¶ 125), but he fails to provide any evidence suggesting that Rubenstein breached his fiduciary duty by entering into that agreement or that LSH CO used those negotiations to assist, induce, or encourage Rubenstein to breach his fiduciary duty by entering into that agreement. For example, while the Settlement Agreement states that Wells Fargo and LSH CO agreed to "a full and final settlement and release of all claims that could have been asserted against Rubenstein, both individually and as Trustee" (Settlement Agreement, Dkt. 124-46, at 3), Inzlicht-Sprei provides no evidence that the release of claims against Rubenstein individually motivated him to enter into the Settlement Agreement. Rather, Rubenstein testified at his deposition that he signed the Settlement Agreement because he "was acting as a fiduciary to the [T]rust . . . in order to make sure that the [T]rust is not engaging in any fraudulent activities." (Rubenstein Dep., Dkt. 124-9, at 161:4–16); *cf. Obeid*, 2019 WL 1227789, at *4 ("Knowing participation may be inferred where it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations or where the terms of the transaction are so egregious, or the magnitude of the side deals is so excessive as to be inherently wrongful.") (internal quotation marks and citation omitted). Nor does Inzlicht-Sprei offer any evidence that LSH CO actually suggested or threatened to bring individual claims against Rubenstein if he refused to settle. (*Cf.* Dkt. 131, at ECF 35 (stating that if Rubenstein is not prepared to execute the declaration, Wells Fargo "will proceed with the prosecution of Well Fargo's claim" against the Trust); Wells Fargo

Answer, Dkt. 27, at 8–9 (stating that its claim for indemnification was against "the Trustees," not Rubenstein in his personally capacity).)

Finally, while Inzlicht-Sprei seems to rely on the fact that Wells Fargo's 30(b)(6) witness stated that Wells Fargo did not have an agreement or understanding with Rubenstein as evidence that Rubenstein and LSH CO were hiding the Settlement Agreement from Inzlicht-Sprei[37] (Inzlicht-Sprei 56.1 Response, Dkt. 140-1, ¶¶ 131–32), the fact that the Wells Fargo representative witness was unaware of the Settlement Agreement does not, on its own, support the inference that LSH CO encouraged or induced Rubenstein to keep the agreement a secret from Inzlicht-Sprei. Likewise, the fact that LSH CO knew about the settlement negotiations and/or that Rubenstein was potentially breaching his fiduciary duty by engaging in them and did not tell Inzlicht-Sprei is also insufficient to establish substantial assistance. *See In re Sharp Int'l Corp.*, 302 B.R. at 774 ("In general, inaction—*e.g.*, a failure to investigate or to alert third parties about another's misconduct—does not constitute substantial assistance, unless the defendant owes a special duty directly to the plaintiff."). Though initial drafts of the Settlement Agreement stated that it was confidential (Wells Fargo 56.1 Response, Dkt. 126-1, ¶ 90), the final Settlement Agreement did not include a confidentiality provision (LSH CO 56.1, Dkt. 122-2, ¶ 139), and Inzlicht-Sprei does not provide any emails or communications between LSH CO and Rubenstein, or their attorneys, telling Rubenstein that he should not inform Inzlicht-Sprei of the settlement or any evidence that Rubenstein was prevented from telling Inzlicht-Sprei about the settlement. Further, Inzlicht-Sprei was provided a copy of the Settlement Agreement, by Wells Fargo's counsel, the day after it was

---

[37] Though Inzlicht-Sprei refers to the deposition of the Wells Fargo 30(b)(6) witness to dispute LSH CO's assertion that the Wells Fargo representative was not asked whether LSH CO or Wells Fargo was attempting to negotiate an agreement with Rubenstein, he does not provide a citation to indicate where in the representative's deposition this testimony occurred. (*See* Inzlicht-Sprei 56.1 Response, Dkt. 140-1, ¶¶ 131–32.)

fully executed. (*Id.* ¶¶ 133, 144.) Thus, there is simply insufficient evidence from which a reasonable jury could find that Rubenstein, at the behest of LSH CO and Wells Fargo, sought to conceal the Settlement Agreement from Inzlicht-Sprei.

Therefore, the undisputed facts show that far from assisting, inducing, or encouraging Rubenstein to breach his fiduciary duties, LSH CO, at most, engaged in the type of common-place settlement negotiations that the law encourages. *Cf. Carson Optical, Inc. v. Hawk Imps., Inc.*, No. 12-CV-1169 (GRB), 2013 WL 5740452, at *4 (E.D.N.Y. Oct. 10, 2013) ("The law strongly encourages settlement of disputes. 'Compromises of disputed claims are favored by the courts.'") (quoting *Williams v. First Nat. Bank*, 216 U.S. 582, 595 (1910)). Having failed to show there is a material dispute as to one of the elements of his claim, Inzlicht-Sprei's aiding and abetting claim fails, and the Court finds that LSH CO is entitled to summary judgment on this claim.

## CONCLUSION

For the reasons set forth above, Wells Fargo's motion for summary judgment declaring that Wells Fargo is entitled to the Policy proceeds is granted. Inzlicht-Sprei's motion for summary judgment declaring that he is entitled to the Policy proceeds is denied. Inzlicht-Sprei's motion for summary judgment as to LSH CO's breach of contract/indemnification claim is denied as moot. LSH CO's motion for summary judgment as to Inzlicht-Sprei's cross-claim for aiding and abetting a breach of fiduciary duty by the Trustee is granted. The Clerk of Court is respectfully directed to release and disburse all funds, with interest, to Wells Fargo, enter judgment, and terminate this case accordingly.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 31, 2020
       Brooklyn, New York